UNITED STATES of America, by Nicholas deB. KATZENBACH, Attorney General of the United States, Plaintiff,

v.

GULF–STATE THEATERS, INC., a corporation, et al., Defendants.

No. GC6450.

United States District Court
N. D. Mississippi,
Greenville Division.

June 29, 1966.

Robert F. Kennedy, Atty. Gen., Burke Marshall, Asst. Atty. Gen., Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., St. John Barrett, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Hardy Lott, Stanny Sanders, Lott & Sanders, Greenwood, Miss., for defendants.

Before BROWN and COLEMAN, Circuit Judges, and CLAYTON, District Judge.

PER CURIAM.

This action was brought by the Attorney General pursuant to 42 U.S.C. § 2000a–5(a) to obtain injunctive relief against an alleged pattern or practice of resistance by the owners and operators of motion picture theaters to the full enjoyment by Negroes of rights secured by 42 U.S.C. § 2000a(a). The defendant Gulf-State Theaters, Inc. was alleged to be the operator of a chain of twenty-four theaters in Mississippi whose operations affected commerce, 42 U.S.C. § 2000a, subsections (a), (b), (b) (3), and (c)

(3), so that they were obligated to provide non-discriminatory services pursuant to 42 U.S.C. § 2000a(a). The defendants were charged with maintaining a policy of refusing to admit Negroes to the theaters because of their race, which policy constituted the pattern or practice against which relief was sought. Upon the Attorney General's certificate that the case was one of general public importance and his request therefor, a court of three judges was convened pursuant to 42 U.S.C. § 2000a–5(b).[1] Jurisdiction of this action in this court obtains by virtue of 42 U.S.C. § 2000a–6(a) and 28 U.S.C. § 1345.

Originally named as defendants were Gulf-State Theaters, Inc.; T. G. Solomon, president of Gulf-State; and Elizabeth Rogers, manager of the Paramount Theater in Greenwood, Mississippi, which was allegedly a member of the Gulf-State chain. Their answers alleged that the Paramount was owned, not by Gulf-State, but by Greenwood Theaters, a partnership consisting of Gladys, Inc. and W. A. Prewitt, Jr., a resident of Texas. The government then moved, and the court ordered, the addition of Greenwood Theaters and Gladys, Inc. as defendants. Prewitt is not a party.

In addition to denying the allegations of pattern and practice, the answers presented a full scale attack upon the constitutionality of the Civil Rights Act of 1964. During the delay occasioned by the reconstituting of the court, note 1, supra, intervening decisions of the Supreme Court disposed of the defendants' contentions in this regard to a great extent. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed. 290 (1964). Nevertheless, the de-

1. A trial on the merits was held in January 1965, but before judgment one of the members of the court died. Upon stipulation of the parties, a successor was designated to participate in disposition upon the basis of the record and briefs of counsel. The first judge thus designated was relieved prior to judgment and Judge Coleman was then designated to sit with Judges Brown and Clayton. Judge Coleman has examined and considered the record, the transcript of the evidence and the briefs of the parties and he has fully conferred with the other judges.

fendants continue to urge in their brief that 42 U.S.C. § 2000a, although constitutional with respect to hotels and restaurants, is unconstitutional with respect to motion picture theaters. They contend that there was no rational basis for the congressional finding that the elimination of racial discrimination in theaters which present films which move in interstate commerce would affect that commerce. They also claim that any effect on commerce of such elimination would be detrimental.

■ We reject this argument and sustain the constitutionality of this portion of the Civil Rights Act of 1964. The legislative history on the effect of racial discrimination in theaters has been furnished to this court and may also be found as an appendix to the opinion of the court in Twitty v. Vogue Theatre Corporation, 242 F.Supp. 281 (M.D.Fla. 1965), in which a similar contention was made and rejected. That material is not voluminous, but no volume of testimony is necessarily required. Twitty v. Vogue Theatre Corporation, supra; Heart of Atlanta Motel, Inc. v. United States, supra, concurring opinion of Black, J. Moreover, judicial inquiry is not limited to the legislative history. We must ask whether any state of facts, either known or reasonably to be assumed, affords support for the legislative conclusion. Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). In the light of these considerations Congress could reasonably arrive at the challenged conclusion. The most that can be said for the evidence offered by the defendants to the contrary is that the congressional conclusion might be debatable. The defendants' evidence does not rise to the stature necessary to carry their burden of proving that Congress had no rational basis for finding that this particular type of discrimination had an adverse effect on interstate commerce. Heart of Atlanta Motel, Inc. v. United States, supra; Katzenbach v. McClung, supra. Where all of the circumstances indicate that it is at least debatable whether racial discrimination in theaters presenting films which move in interstate commerce affects that commerce, resolution of that question is for Congress and the finding of a court arrived at by weighing the evidence cannot be substituted for it. United States v. Carolene Products, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Breard v. City of Alexandria, supra.

■ The defendants also contend that Negroes have not been denied admission to the Paramount Theat.. in Greenwood because of their race. They argue that in some of the other theaters in which they (or part of them) have an interest, Negroes are not discriminated against and, therefore, the exclusion of Negroes from the Paramount is motivated by some reason other than the defendants' objections to Negroes as such. This other reason is claimed to be purely economic, i. e., Negroes are unacceptable to the non-Negro patrons upon whose continued support the business depends. This distinction is one without a difference and is predicated upon a misunderstanding of the law. The Civil Rights Act is not concerned with the subjective racial prejudices of the people affected. Instead it is directed toward discrimination against certain classes of persons when those classes are determined on the basis of race, color, religion, or national origin. Negroes are admittedly excluded from the Paramount Theater. It is no mere coincidence that the group of persons to which the regular patrons object is composed of members of the Negro race. They are excluded because they are Negroes, regardless of the presence or absence of racial prejudices in the minds of the defendants. This the law forbids, and this court has no alternative to enjoining such practice.

■ As to the Paramount Theater, the defendants relied principally upon the defenses discussed above. They admitted that the Paramount was a motion picture theater which customarily presented

films which moved in interstate commerce and that Negroes as a class were denied admission. The testimony of the defendants Solomon and Rogers is ample to sustain a finding that the defendants Greenwood Theaters, Gladys, Inc., and Solomon engaged in a pattern and practice of denying to Negroes the full enjoyment of their right to non-discriminatory admission to, and use of the facilities of the Paramount Theater and that this pattern and practice is of such a nature as to deny to Negroes the free exercise of those rights as it is intended to do. We so find.

■ The Paramount Theater is owned, operated and controlled by the defendant partnership, Greenwood Theaters. The only partner before the court is Gladys, Inc., the stock of which is wholly owned by the defendant Solomon, who also serves as its president. Greenwood Theaters, Gladys, Inc. and Solomon should and will be enjoined to cease their resistance to the full enjoyment of the rights protected by 42 U.S.C. § 2000a, in the Paramount Theater. The defendant Rogers is employed by the partnership as manager of the theater and, in this instance, has been completely subject to her employer's orders. No valid purpose would be served by granting an injunction against her by name since the position occupied by her will be covered by the language of the order which will be entered. But, for reasons which will be mentioned below, Gulf-State will not be included in the injunction with respect to the Paramount.

There are twenty-three other theaters in Mississippi which the government claims are part of the Gulf-State chain. The plaintiff contends that Gulf-State's functions in connection with all twenty-four theaters are in fact so broad as to be equivalent to control. It is urged that Solomon's relationship with Gulf-State, on the one hand, and his relationship with the various theaters, on the other, when considered in the light of the functions of Gulf-State, requires a finding that the corporation and the individual are jointly responsible for the racial policies of the various theaters.

■ The proof shows that these theaters and those in other states which are serviced by Gulf-State are popularly and interchangeably known as "Gulf-State theaters" and "Solomon theaters." However, it is uncontroverted that Gulf-State, as such, does not own any theaters nor does it have any proprietary interest of any kind in, or any power of control over, any theaters anywhere. Its operations are limited to providing bookkeeping [2] and "booking" [3] services and a service which might be described as management advice [4] to various theaters in return for fees. The booking and bookkeeping services may be separately or jointly engaged. Most of the theaters which are thus serviced are connected in some way with Solomon, who also owns 51% of the stock of Gulf-State and serves as its president.

Although the scope of these services may be broad enough to encompass a major portion of the ordinary managerial functions, Gulf-State does not formulate policy for its clients nor exercise any control over them. Gulf-State does not set admission prices and it does not de-

2. The bookkeeping service is provided in return for a fee based on ticket sales and includes the handling of practically all of the exhibitors' financial transactions with the exception of minor expenditures, the keeping of financial records, and the preparation of tax returns. Forms, records, and similar items necessary for reporting the needed information is supplied to the exhibitors by Gulf-States.

3. "Booking", provided for a similar fee, involves the procurement of films from the distributors and the allocation of these films to the exhibitor-clients. Gulf-State pays the rental fee to the distributor, which is normally a percentage of the income derived from ticket sales, and is in turn reimbursed by the exhibitors.

4. This service includes periodic inspection of the theaters for cleanliness, maintenance, quality of picture and sound, etc. It is provided as an adjunct of the booking service, without additional fee.

termine what persons or classes of persons will be admitted or excluded from the theaters. The government contends that the corporation does set racial policy and it points to a letter on Gulf-State stationery written by Solomon on 24 June, 1964, in which he instructed all managers to continue to operate on a segregated basis. Solomon testified, however, that for purposes of economy, he used that stationery in all of his correspondence, both business and personal, and that none of the other enterprises in which he had an interest had their own letterheads. We view this letter as revealing, not Gulf-State's involvement in matters of racial policy, but Solomon's. A letterhead alone is too fine a thread with which to connect Gulf-State to the admissions policies of the exhibitors. We conclude that injunctive relief against Gulf-State Theaters, Inc. should not be granted.

Solomon, on the other hand, influences and may to a large extent control the policy of all theaters here involved. His ability to exercise control of the twenty-four theaters in which he has an interest varies. Two [5] of these twenty-four theaters are operated by partnerships in which Solomon, as an individual, has a half interest. Of the remaining twenty-two theaters, eight are operated by six separate corporations.[6] Solomon is sole stockholder and president of one of these corporations; he owns a controlling interest in a second, of which he is also president; he owns 50% or less of the stock in three corporations, which he serves either as president or secretary-treasurer; and he is president of one corporation in which he owns no stock. The fourteen remaining theaters are operated by partnerships in which at least one of the partners is a corporation in which Solomon owns some stock.

5. 1. Canton Theater, Canton, operated by T. G. Solomon and Mrs. America Solomon as equal partners.

2. Crystal Theater, Crystal Springs, operated by T. G. Solomon and Donald B. Stafford as equal partners.

6.

| Theater | Operated By | Solomon's Interest |
|---|---|---|
| 1. Honey Theater, Indianola | Indianola Theaters, Inc. | Sole stockholder and president |
| 2. Do Drive-In Theater, Gulfport | Gulf-Coast Theaters, Inc. | Owns 100 of the 101 shares and is president |
| 3. Pen Drive-In Theater, McComb | McComb Drive-In Theaters, Inc. | Owns 50% of the stock and is president |
| 4. Baker Grand Theater, Natchez | Natchez Theaters, Inc. | Owns 49% of the stock and is president |
| Clark Theater, Natchez | | |
| 5. State Theater, McComb | The Pike Amusement Company, Inc. | Owns 50% of the stock and is secretary-treasurer |
| Palace Theater, McComb | | |
| 6. Yazoo Theater, Yazoo City | Yazoo Theaters, Inc. | Owns no stock, but is president |

Solomon is either the sole or controlling stockholder in one or more of the corporate partners in the partnerships operating eleven [7] of these theaters and these Solomon corporations have either a 25% or 50% interest in the partnerships. As

[7]

| Theater | Operating Partnerships | Solomon's Interest |
|---|---|---|
| 1. Paramount Theater, Greenwood | Greenwood Theaters:<br>a. W. A. Prewitt, Jr., 50% interest<br><br>b. Gladys, Inc., 50% interest | Sole stockholder and president of Gladys, Inc. |
| 2. Joy Theater, Vicksburg<br><br>Strand Theater, Vicksburg | Joy Theaters:<br>a. W. A. Prewitt, Jr., 50% interest<br><br>b. Vegas Theaters, Inc., 50% interest | Sole stockholder and president of Vegas Theaters, Inc. |
| 3. Skyvue Drive-In Theater, Jackson<br><br>Varia Drive-In Theater, Jackson | Jackson Drive-In Theaters:<br>a. W. A. Prewitt, Jr., 50% interest<br><br>b. Skyvue, Inc., 25% interest<br><br>c. Varia, Inc., 25% interest | Owns 1190 of the 1200 shares of Skyvue, Inc. Owns 90 of the 100 shares of Varia, Inc. 10 shares of each corporation are owned by a trust.<br>Solomon is president of both corporations |
| 4. Joy Drive-In Theater, Greenville<br><br>Temple Theater, Leland | Delta Theaters:<br>a. Mrs. J. C. Noble, 50% interest<br><br>b. W. A. Prewitt, Jr., 25% interest<br><br>c. Gloria, Inc., 25% interest | Sole stockholder and president of Gloria, Inc. |
| 5. Haven Theater, Brookhaven<br><br>Dixie Theater, Brookhaven | Brookhaven Theaters:<br>a. Mrs. E. C. Downing, 50% interest<br><br>b. Donald B. Stafford, 25% interest<br><br>c. Brookhaven Theaters, Inc., 25% interest | Sole stockholder and president of Brookhaven Theaters, Inc. |
| 6. Beach Drive-In Theater, Biloxi<br><br>Don Drive-In Theater, Gulfport | Gulf-Coast Drive In Theaters:<br>a. Beach Drive In, Inc., 50% interest<br><br>b. Dixie Theaters, Inc., 25% interest<br><br>c. Sunny South Theaters, Inc., 25% interest | Sole stockholder and president of Sunny South Theaters, Inc. |

to the remaining three theaters,[8] the precise interest of Solomon is not established by the record. However, either Solomon or members of his family own the stock in one of the corporate partners and Solomon owns 50% of the stock of the other corporate partner. The other 50% of the stock is owned by the individuals who also have the remaining one-third interest in the partnership.

In those theaters which, because of his partnership interest or his stock ownership, he controls, there is no doubt that Solomon and Solomon alone is the final authority on questions of policy. In the theaters in which other persons or interests have an equal or superior authority, it is nevertheless true that Solomon has in the past exerted actual control in many areas of policy. He has a wide reputation for his experience and ability in this field and his participation in some ventures has been solicited by those who wished to resurrect an unsuccessful or mediocre theater operation. The inference is reasonably drawn that despite his power or lack of power to legally (or technically) exercise control of individual theaters, the respect with which his business associates regard his judgment has resulted in many cases in their acquiescence in Solomon's wishes. Again and again in his testimony Solomon confirmed this in his references to himself as the authority on admission prices, hours of operation, and in other areas.

This is not to say however, that Solomon has final and conclusive authority in all areas of policy. Certainly there is evidence that the other individuals who occupy positions similar to Solomon's in the several business arrangements participate in policy decisions with authority commensurate with their holdings, and on some issues they have overruled Solomon. One example of this was the objection of some of Solomon's associates to his practice of subjecting employees to periodic polygraph tests. In the theaters operated in part by the objecting associates, the tests are not conducted.

The evidence is ample to establish, and we find, that the twenty-three theaters, in addition to the Paramount, which are listed in notes 5–8, supra, are motion picture theaters which customarily present films which move in interstate commerce. We therefore conclude that their operations affect commerce and that they are places of public accommodation within the meaning of 42 U.S.C. § 2000a.

The evidence as to the racial policies of the twenty-three Mississippi theaters other than the Paramount Theater in Greenwood, and Solomon's part in setting or influencing those policies reveals some small progress toward compliance with the Act between the time that the action was filed and the date of the trial. The government's case in chief consisted solely of Solomon's deposition, which was taken on 29 October, 1964.

8.

| Theater | Operated By | Solomon's Interest |
| --- | --- | --- |
| Towne Theater, Pascagoula | Pascagoula-Moss Point Theaters: | Solomon or his family own all stock in Pascagoula Theaters, Inc. |
| | a. Pascagoula Theaters, Inc., 33⅓% interest | Solomon owns 50% of stock of Moss Point Theaters, Inc. and is president |
| Royal Theater, Moss Point | | |
| Lake Drive-In Theater, Pascagoula | b. Moss Point Theaters, Inc., 33⅓% interest | |
| | c. Mr. and Mrs. W. M. Butterfield, 33⅓% interest | |

At that time, Solomon named six [9] theaters in which Negroes were required to sit in a separate section; two [10] theaters to which Negroes were not admitted at all; and three [11] theaters—all drive-ins—to which Negroes were freely admitted. There is no evidence specifically directed to each of the remaining twelve theaters. The letter of 24 June, 1964, instructed all managers to continue to operate their theaters on a segregated basis.

In early December 1964, shortly before the trial, Solomon called a meeting of managers. One of the two theaters named in note 9, supra, had been desegregated and Solomon expressed his opinion that all managers should comply with the Act, but went no further. Having once directed a policy of noncompliance he left the decision as to withdrawal from that policy in the hands of the managers. At the trial Solomon testified in effect that at that time, as opposed to several months earlier, the managers would not be compelled (insofar as he had the power to do so) to maintain a separate seating policy for Negroes. He further testified that at that time, as far as he personally was concerned, the Paramount Theater in Greenwood was the only theater in which he had an interest which either excluded Negroes or required separate seating. But he could not give any assurance that the managers had all complied with that view, and he stated that at one of those theaters, the Paramount, an injunction would be necessary to change the policy of discrimination. Solomon described his general policy as being that these theaters would comply with the Act only in those communities in which other places of public accommodation had been desegregated without incident; if the members of the community evinced opposition to desegregation the theaters would not take the lead toward compliance with the Act.

We find that the racial policy of the theaters flows largely from Solomon and that in determining the degree to which individual theaters would resist or comply with 42 U.S.C. § 2000a, Solomon has been an active and usually dominant force. In the view we take of this case, there is no need at this time for findings as to the racial policies extant in each of the other twenty-three theaters. Of the various individuals, partnerships and corporations which control the twenty-three theaters other than the Paramount Theater, only Solomon is before the court. Plaintiff's case against these other ownership interests is thus imperfect party-wise, or process-wise, either or both. It would, as we feel, be improvident in this case to attempt to grant relief against these interests which are not now before this court in this case. But, Solomon's future actions in all of the theaters can be governed by this court's decree. Solomon's part in the pattern and practice of resistance in the case of the Paramount Theater, the degree to which he has been responsible for the racial policies of all the theaters, the substantial number of theaters which shortly before the trial were not complying with the Act, and the absence of any adequate assurance that all of the theaters had ceased their discriminatory policies, all combine to provide adequate justification for granting relief against Solomon with respect to all twenty-four theaters.

We conclude that Solomon should be enjoined to refrain from urging, advocating, recommending, establishing, or continuing a policy of noncompliance with the Act in any of the theaters. To the extent that he now actually controls any of these theaters, directly or indirectly, this necessarily means that they must comply with the Act. Of course, we do not limit Solomon's right to divest himself of actual

9. Canton Theater, Canton; Temple Theater, Leland; Honey Theater, Indianola; Crystal Theater, Crystal Springs; Baker Grand Theater, Natchez; Dixie Theater, Brookhaven.

10. Palace Theater, McComb; Haven Theater, Brookhaven.

11. Joy Drive-In Theater, Greenville; Beach Drive-In Theater, Biloxi; Don Drive-In Theater, Gulfport.

control (or to relinquish such control) of any of the theaters, thereby, and to that extent, relieving himself of the responsibility for racial policies adopted without his participation by those who succeed him. Nor do we make Solomon responsible for impermissible policies which might be adopted in any theater by his partners or fellow stockholders who, because of their holdings, have the power to overrule him and do so, *provided and so long as* Solomon is in no way a consenting participant in the adoption of those policies.

Decree will be entered in accordance with the foregoing.