UNITED STATES of America by Nicholas deB. KATZENBACH, Attorney General of the United States, Plaintiff,

v.

Charles SAMPSON, Mayor of the City of Greenwood and Member of the Greenwood City Council, et al., Defendants.

No. GC6449.

United States District Court
N. D. Mississippi,
Greenville Division.

July 11, 1966.

Robert F. Kennedy, Atty. Gen. of United States, Burke Marshal, Asst. Atty. Gen of United States, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., St. John Barrett, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Hardy Lott and Stanny Sanders, Lott & Sanders, Greenwood, Miss., for defendants.

Before BROWN and COLEMAN, Circuit Judges, and CLAYTON, District Judge.

PER CURIAM:

This action was brought by the United States pursuant to section 206(a) of the Civil Rights Act of 1964, [42 U.S.C. § 2000a–5(a)] against the Mayor, Police Commissioner, Chief of Police and Assistant Chief of Police of the City of Greenwood, Mississippi, to obtain injunctive relief against alleged violation of that Act by the defendants. Upon the Attorney General's request and upon his certification that in his opinion, the case is one of general public importance, 42 U.S.C. § 2000a–5(b), a court of three judges was convened to hear the case. Trial on the merits was held in January 1965 before the court as originally constituted. Afterward one of the judges of that original court died before judgment. The parties stipulated that a replacement for the deceased judge could be appointed to participate in disposition on the basis of the record on briefs. The first replacement judge designated pursuant to the stipulation was relieved before judgment and Circuit Judge Coleman was designated to sit with Judges Brown and Clayton for disposition. He has examined and considered the full record in this case, the transcript of the evidence taken and the briefs and has participated fully in conference with the other two judges.

■ The focal point of the controversy here is the Leflore Theater in Greenwood, Mississippi. We hold that this theater, as its owners concede and the government claims, was a place of public accommodation within the meaning of 42 U.S.C. § 2000a(a), since it

showed films which moved in interstate commerce, 42 U.S.C. § 2000a(c) (3), and therefore was an establishment whose operations affected commerce, 42 U.S.C. § 2000a(b) (3). Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Twitty v. Vogue Theatre Corporation, 242 F.Supp. 281 (M.D.Fla.1965); United States v. Gulf-State Theaters, Inc., 256 F.Supp. 549 (N.D.Miss. June 29, 1966). Prior to the effective date of the Act, 2 July, 1964, the theater maintained a policy of racial discrimination in that it admitted only members of the white race to its shows. Shortly before the effective date of the Act, the owners of the theater determined that they would "obey the law" and discontinue their former policy of racial discrimination in full compliance with the mandate of the Act. The local manager so advised defendants, and at least some of them suggested that he not comply with the Act until its constitutional validity had been tested in the courts. We think it can be fairly stated that defendants believed in good faith that the Act was unconstitutional and that they were opposed to its passage and to its enforcement, until its constitutionality could be adequately tested in the courts.

When the new policy of the theater became effective Negroes began to attend the scheduled showings of motion pictures therein. The first one to do so was attacked, following which he was escorted by the local manager to the Greenwood Police Station. There he was unable to identify his assailant and he refused to return to the theater with the chief of police to try to do so. At this victim's request, the assistant chief of police drove him approximately three miles out into the country to his home.

A few days later when a second effort was made by a Negro to attend this theater, he was attacked by other patrons of the theater (all of whom were white) in spite of remonstrances by the theater manager. The assistant chief of police responded to a call, and when he arrived at the theater, he found the second victim in the theater manager's office and the theater manager requested this officer to take him away. This victim was escorted to the police station by the officer who, with the chief of police, assumed that the manager intended to file some criminal charge.[1] When the assistant chief of police promptly returned to the theater, he then learned from the manager for the first time that no charges were contemplated. The officer immediately returned to the police station and advised the victim that he could leave. And he did so.

None of the defendants were told anything about any assault on this Negro until later in the night, long after this victim had departed. On that night the police commissioner upbraided the theater manager for calling for police to remove a person from the theater when no charges were to be filed against him.

Shortly after this second incident, the manager of the theater persuaded six Negroes who had purchased tickets and had been admitted, to leave the theater after their money was refunded. They did this after a statement was read to them by an attorney whose services were engaged by the theater manager. None of the defendants are shown to have had any connection with this incident. However, two days later, the police commissioner telephoned the president of the corporation which owns and operates this theater and tried to persuade him not to comply with the Act until it was tested in the courts, saying that the police department could not prevent assaults on Negro patrons, such as the two which had occurred, nor handle the difficulties arising from desegregation of the theater. This call was unsuccessful.

---

1. We cannot say that this assumption was not justified. The manager was excited almost to the point of hysteria when the officer arrived and was concerned only with the prompt removal from his office of the victim, who was dishevelled and bleeding.

On July 12, the City Council of Greenwood passed an ordinance giving the chief of police the power to close a business establishment whenever he felt that a breach of the peace was likely to occur. The admitted purpose of this ordinance was to deal with the situation at the Leflore Theater. Within hours after the passage of this ordinance, the defendant chief of police required the local manager to close the theater. This interdiction was not long lived, but lasted for only one day.

During the remaining portion of July, at least two other incidents occurred which involved Negro patrons of this theater. Continuously for a number of nights, white people had gathered in substantial numbers on private property and across the street from this theater on the three other corners of the intersection at which the theater is located. Most of the times the composition of these gatherings was constantly changing, with some people leaving and others coming. It also must be noted that most of the times, with respect to Negro patrons of the theater, these people did nothing more than verbally harass or heckle them or greet their appearances with the sounding of automobile horns. On one occasion when Negro patrons were leaving the theater, someone followed the automobile in which they were riding in other automobiles and an effort was made to block a street to prevent movement of that vehicle. It must be noted that this effort was aborted because of the prompt action of local officers.

It is to be noted also that these gatherings were under observation by an auxiliary policeman at the scene who was equipped with a short wave radio over which he relayed current information to the police department and that patrol cars of the police department were regularly cruising in the neighborhood.

On one occasion, these crowds surged across the streets and onto the property of the theater with the apparent intention of causing harm to some Negro patrons who were attempting to leave the theater, but these patrons were safely escorted by officers of the police department to an automobile in which they departed. As this automobile was departing, someone from the crowd threw an object which broke a glass in the automobile and showered some of the occupants with glass fragments.

The aforementioned automobile drove immediately to the Greenwood Leflore Hospital, where two of the Negroes claimed to have been hurt. They testified that they had their eyes washed out, but no doctor, nurse or other witness testified that they were injured in any way. No one testified that they could observe anything wrong with their eyes or anything else about them. One FBI agent testified that one of these people told him that his injury was a scratch on the arm, but this agent could see nothing when he looked at the arm and testified that the skin was not broken and the arm was not bleeding. These people stayed at the hospital for several hours and personnel from civil rights organizations with whom they were working released false information to news media that these people were being held hostage in the hospital.

There was some claim that unknown people were planning to do great harm to this group at the hospital, but there was no credible evidence that there was ever any danger to them at any time while they were at the hospital. During that time, there were present at the hospital eight to ten armed FBI Agents, the Sheriff of Leflore County, a Mississippi State Highway Patrolman, and from five to seven Greenwood Policemen, including the Chief of Police. The evidence shows that there were present at the hospital more automobiles of law enforcement officers and more law enforcement officers than other automobiles or other people identified as being in the area by any witness. A police patrol car with two Greenwood policemen in it constantly circled the hospital during the time when these people were inside, and all people and automobiles in the area

found not to have legitimate business there were required to move on.[2]

In addition to the aforementioned officers who were there present and available, the police commissioner also visited the hospital and neither saw nor heard anything out of the way.

When these "victims" and their friends decided to leave the hospital, they were escorted by the sheriff in his automobile and by officers of the Greenwood Police Department from the hospital to the place where they wanted to go. Two of these people were escorted out of the city limits to their place of residence by the sheriff.

Since July 26, 1964, until the date of the hearing, there were no other incidents which involved any Negro patron of this theater, and Negro patrons have been peacefully attending this theater regularly since at least September 1964.

During the times when the aforementioned incidents were occurring, there were numerous acts of vandalism committed during the nighttime against the property of the Leflore Theater. On one occasion, a stink-bomb was released during the presentation of a program. At another time, there was an electric power failure during such a program.

The Greenwood Police Department investigated every one of these acts of vandalism and in fact stationed officers in the theater at night, all night long, in an effort to apprehend those who were responsible for these acts. It may be that the defendant chief of police and the defendant assistant chief of police and the police department were inept in not discovering who these vandals were and in not developing enough evidence to warrant prosecution. However, it must be borne in mind that Greenwood has only thirty-two full time policemen and that it is a city of approximately 20,000

people which is spread out over a large area. Considering their many responsibilities with respect to other sections of this city, it probably appeared to them that reasonable efforts were being made to solve these crimes, and it must also be borne in mind that at times there were more special agents of the Federal Bureau of Investigation present in Greenwood working to solve these same crimes than there are members of this police department. If it is said that the Greenwood Police Department was inept, then it must also be said, so was the Federal Bureau of Investigation.[3]

During the most troubled time with which we are dealing, there was some picketing by white teenage school children in front of this theater in protest against the admission of Negro patrons thereto. As this movement grew and the pickets became equipped with professionally painted signs, defendants were able to obtain a discontinuance of this practice by telephone calls and conferences with the parents of these teenagers and others to whom they would listen.

In addition to the greatly abbreviated essence of the evidence which has been stated, it should also be mentioned that at least two of the defendants regularly attended a series of meetings of the Citizens Council and at least one of them actively participated in the approval of resolutions opposing enactment of the Civil Rights Act of 1964 and later in counseling non-compliance with its terms until its constitutional validity had been fully tested in the courts.

It is the theory of plaintiff that this thin structure of evidence shows a conspiracy on the part of defendants with the persons who perpetrated the assaults on Negro patrons of the theater and who perpetrated the acts of vandalism against

---

2. A change of shift for personnel at the hospital occurred during this time and some vehicles and some people were there legitimately because of this.

3. It also is well to note that members of the Negro race who were personally directly involved in these incidents co-operated fully with the FBI, but not with the Greenwood Police Department.

the theater property to deprive members of the Negro race of their rights to equal enjoyment of places of public accommodations, contrary to the provisions of the Act. Plaintiff also contends that defendants in effect wilfully failed to disperse "mobs" who were bent upon injury to Negro patrons of the theater, but this contention must be weighed in the light of another suit by the same plaintiff against the City of Greenwood (which was also against some of these defendants) which, as this court judicially knows, was pending during the times with which we are here concerned. (United States of America v. City of Greenwood, Mississippi, No. GC638). In that action the United States sought pursuant to 42 U.S.C. § 1971 to enjoin the City of Greenwood and others from interfering with First Amendment rights of civil rights inspired groups of people who were parading and protesting on the streets of that city.[4] The actions of defendants with respect to the groups of people who gathered in the vicinity of this theater must also be weighed in the light of the uncontradicted evidence that

no one was able to testify that any of these people had any weapons of any kind or that any of them who could be identified violated any law or committed any act for which they could be prosecuted.[5] And there is evidence that these people got out of hand on only the one occasion which has been mentioned, at which time the Police Department of the City of Greenwood provided protection for the Negroes against whom the activities of these people were directed.

In light of what has been said, we conclude that to grant at this time any of the injunctive relief sought by plaintiff is unwarranted and would serve no useful purpose. This is not to say, however, that plaintiff may not seek similar relief from a one judge court of this district[6] should the need therefor arise (or if the need therefor has already arisen).

An order will be entered denying the relief sought by the plaintiff and dismissing the complaint. Costs will be awarded to the defendants against the plaintiff pursuant to 42 U.S.C. § 2000a–3(b).

4. On 30 March, 1963, the Attorney General instituted an action against the City of Greenwood, Mayor Sampson, Commissioner Hammond, Chief Lary and others for injunctive relief restraining them from, inter alia, "denying to any person, by arrest, prosecution, or otherwise, the right peaceably to assemble in protest against denials of the right to vote or to register to vote * * *;" proceeding with the prosecution of certain demonstrators on disorderly conduct charges; and failing to afford police protection to persons exercising their right "to peaceably assemble for the purpose of encouraging others to exercise or to secure such right to vote."

The action arose from alleged acts of police officers in interfering with civil rights demonstrators by stopping the demonstrations, ordering the demonstrators to disperse and arresting some of those who

did not obey. The action was terminated by a stipulation on 21 October, 1964, which was after all of the incidents with which we are concerned here had occurred.

5. Special Agents of the Federal Bureau of Investigation were regularly in attendance in the immediate vicinity of the theater and these gatherings and a number of them testified with respect to these activities.

6. Of course, such relief also could again be sought from a special three judge court under the provisions of the Act. 42 U.S.C. § 2000a–5(b). But, the long delay from trial to disposition in this case demonstrates, we think, some of the many difficulties which are inherent in the use of such a court for a case of this kind.