**UNITED STATES of America**

v.

**James E. GRAY, d/b/a Gray's Motel.**

**Civ. A. No. 4128.**

United States District Court,
D. Rhode Island.

July 14, 1970.

Jurisdiction is based on 42 U.S.C. § 2000a–6(a) and 28 U.S.C. § 1345.

The defendant resides in North Kingstown, in the District of Rhode Island, and owns and operates a motel therein known as Gray's Motel which provides lodging for transient guests for periods of one day or more.

The complaint alleges that the defendant follows a policy and practice of refusing Negroes admission to and use of the facilities of said motel on the same basis as that afforded to white persons.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Gray's Motel, consisting of 22 units and individual cabins, is an unincorporated business located on U. S. Highway No. 1 in Kingston, Rhode Island and has been owned and operated by the defendant and his wife for approximately 24 years.

It provides lodging for transient guests and about 20% of its business is with military and military-related personnel from the Quonset Naval Air Station and the Davisville Seabee Base located nearby.

There is no question but that it is a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b)(1)[1] and that its operations affect commerce within the meaning of 42 U.S.C. § 2000a(c).[2]

The accusation against the defendant that he had denied Negroes the full use and enjoyment of his motel because of their race is based on his conduct as

Lincoln C. Almond, U. S. Atty., Providence, R. I., Gary T. Brinsfield, Dept. of Justice, Washington, D. C., for plaintiff.

Kenneth M. Beaver, Providence, R. I., for defendant.

## OPINION

PETTINE, District Judge.

This is an action brought by the Attorney General, on behalf of the United States, pursuant to the provisions of 42 U.S.C. § 2000a–5.

---

1. Title II of the Civil Rights Act of 1964 outlaws discrimination on the basis of race, religion or national origin in places of public accommodation. Section 201(b) of that statute (42 U.S.C. § 2000a–b) defines those places covered by the Act:

    Each of the following establishments which serves the public is a place of public accommodation within the meaning of this Title, if its operations affect commerce, or if discrimination or segregation by it is supported by state action: (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence.

2. Section 201(c) of that statute (42 U.S.C. § 2000a–c) states in part:

    The operations of the establishment affect commerce within the meaning of this Title if, (1) it is one of the establishments described in paragraph (1) of subsection (b). * * *

it pertained to Mr. Henry May on July 2, 1966, and to Mr. and Mrs. Lawrence Burrell and Mr. William Bolden and his daughter Sybil on August 17, 1968.

The very nature of this case requires a detailed finding of the facts as they pertain to the specific accusations relative to the defendant's conduct concerning each of these individuals and his operational practice toward guests seeking accommodations.

## HENRY MAY

On July 2, 1966, Mr. Henry May, a New York resident, en route to Newport, Rhode Island at about 7:00 a. m., inquired at a service station in the Kingston area about nearby accommodations. As a result, he phoned Gray's Motel and testified that he spoke with a person who identified himself as James Gray and on inquiry was told that a cabin was available for $15 a day. Within fifteen minutes thereafter, Mr. May arrived at the motel and parked his car in one of the vacant spaces in front of the units.

The essence of the accusation must stem from the ensuing *vis a vis* conduct of the parties. Mr. May testified that as he entered the motel office and approached the desk, Mr. Gray looked at him and then continued talking on the phone for about ten minutes. When Mr. Gray completed his telephone conversation, he asked if he could help, whereupon Mr. May identified himself by name and as the individual who had phoned fifteen minutes before and was informed that a cabin was available. Mr. Gray denied he talked with anyone and Mr. May's insistence that he called and Mr. Gray's repeated denials kindled tense feelings between them, as is evident from May's following testimony:

"I became very indignant about the fact that the man denied I had conversation with him and began to insist that he at least recognize that he had spoken to me by phone. In the process of my insistence that he had at least spoken to me he asked me was that my car in front of the unit. I

said yes. He said, 'Mister, you will have to remove your property.' In that split second I realized I might be classified as a trespasser and turned around. I proceeded to remove my auto from his presence."

There was further testimony that following this incident, Mr. May went across the street to a garage and after allegedly seeing a police car pull up to the motel and "a great deal" of police traffic, with Gray looking out of the motel, he phoned the F.B.I., since he was unable to make contact with the N.A.A.C.P. or C.O.R.E. An agent of the F.B.I. arrived and advised him he would not be molested and that he should proceed to find accommodations elsewhere.

An F.B.I. report of this incident was made and introduced as an exhibit. However, its recitation that confirmation of a reservation was denied by Gray because he saw that May was a Negro and that Gray said no lodgings of any type were available is not supported by the evidence. The parties never reached this point. While in the motel, May never did ask for accommodations and Gray never did say none were available. Mr. May himself testified he didn't ask because after the response he had received, he just didn't feel it was safe. "I don't think I'd feel safe having my bags where * * * "

Mr. Gray's answer to all this is simply that he has no recollection nor any record of such an incident.

## LAWRENCE AND FREIDA BURRELL

On or about the first of August, 1968, Lawrence Burrell of Washington, D. C., in contemplation of attending an International Conference at the University of Rhode Island as a United States Department of State employee and of then remaining in the area for a vacation, contacted Gray's Motel through the American Automobile Association for the purpose of securing a reservation for himself and Mrs. Burrell for a fourteen-day period from August 17 through August 31, 1968.

On August 9, 1968, Mr. Burrell received from Gray a confirmatory letter of the deposit and assurance that the room which he had requested would be held for him.

On August 17, 1968, Mr. & Mrs. Burrell arrived at the motel at approximately 4:30 p. m. Mr. Burrell entered and approached a lady at the desk. He informed her he was Mr. Burrell who had reservations, whereupon she entered a back room and Mr. Gray came out and said he was sorry but that the reserved room was still occupied, in that although the occupants weren't there, the luggage had not been removed. On inquiry from Burrell, Gray stated he had no other vacancies and returned the deposit check. After asking for and getting directions to the University, the Burrells left.

The next day at the University, he told his supervisor what had happened and that he intended to write to the AAA. The supervisor advised Burrell that a law may have been violated and that she would check with her husband, a Justice Department official.

The testimony of Mr. Burrell established that Gray was not antagonistic; treated him courteously; that he, Burrell, did not ask if there would be any vacancies during the fourteen-day period nor did he go back seeking any.

## WILLIAM AND SYBIL BOLDEN

Mr. William Bolden, brother-in-law of Mr. Burrell, wishing to spend part of his vacation with him, wrote to Gray's Motel for reservations in early August or late July of 1968. He received a letter stating a room was available next to that reserved for Burrell. A deposit was mailed by Bolden as requested and a confirmatory letter of receipt and reservation was received.

On August 17, 1968, he arrived at the motel around 9:00 p. m. and approached a lady at the desk informing her he was William Bolden who had reservations. Mr. Gray was contacted. He told Bolden he was sorry but that there was a wedding party in the room and though the people themselves were not there, the luggage had not been removed and the people could not be located. Bolden told Gray he had his six year old daughter with him and could not continue traveling and asked if some other motel could be recommended, whereupon directions were given to one nearby. No inquiry was made as to possible vacancies the next day.

The defendant's answer to the Burrell and Bolden incidents is that he had overbooked his motel and that rooms were not denied because of race or color. On the contrary, he offered proof that over the years he has accepted reservations from Negroes, some of whom stayed for prolonged periods. The plaintiff contends that this position is untenable because the record shows other rooms were available on August 17, 1968, and that the Negro personnel who had been given reservations in the past were members of the armed forces and that Gray, enjoying 20% of his business from the Quonset and Davisville bases, knew that discrimination as to any of them would place his establishment off limits to all such service personnel, thus resulting in a loss of all this business.

From the maze of confused testimony presented in this case on behalf of the government, its distillation leaves us with few certainties as to whether or not rooms were available when Mr. Burrell and Mr. Bolden arrived there.

The ugly stain of racial discrimination cannot find its dye in the scanty evidence presented by the plaintiff that certain specified rooms were available and were refused to Bolden and Burrell.

As to Mr. May, the court discounts completely the position being urged by the United States. The demeanor of this witness and the record testimony causes me to conclude that in July, 1966 when May approached the desk, he became "irked," using his own word, at having been kept waiting while Mr. Gray finished his phone call and at the subsequent denials by Gray that he had made a previous call, fifteen or so minutes prior to his arrival. It became a matter of stubborn desire by May to re-

ceive from Gray this acknowledgment which was not forthcoming and as a consequence the availability of rooms was never discussed. There simply is no evidence that rooms were requested by him or even inquired about. Being ordered to remove his car was the aftermath and end result of tense dialogue between them, and to me, no inference of discrimination can be based on such evidence.

The Bolden and Burrell cases of August 17, 1968 are premised on the theory that having made reservations through the mail, they were not known by Gray to be Negro and therefore their reservation was accepted, but on arrival, he saw their color and for this reason alone refused them lodgings, though rooms were vacant and available. A laborious reading of the confounding evidence reduces itself to a need for an analysis of the testimony of certain witnesses on whom the Government must rely for the position it takes. As a proposed finding of fact by this court, plaintiff argues that:

A) The testimony of a Mr. Harold W. LaForce (Room No. 1) proved the falsity of the registration card entry for this room in that it shows occupancy by LaForce of such facility from August 5, 1968, through August 23, 1968, as against his testimony that he was present only on August 5 and 6. Therefore, the plaintiff seeks the inference of vacancy for this room on August 17, 1968, though the reverse of this same card shows charges paid through August 23.

This cannot be maintained, for following the Laforce in-court testimony, Gray was recalled to explain—which he did. Feeling he was correct in his assertion that this room was occupied, he searched other records and found that his telephone call room listings showed that a Mr. Rasmussen phoned from that room on August 13, 17, 18 and 19. The dates and numbers called were recorded, for charge purposes, against the occupant. Two were repeat numbers and the last, on the 19th, was to the local airport. Gray testified that though the name LaForce on the front of the card for the entire period was not correct, the record of charges on the rear thereof was. The inference is that someone had reoccupied this room without a change of name being placed on the record. I accept this testimony.

B) It is next urged by the plaintiff that the registration card of one Lillian P. Hanson (Room No. 7) shows she arrived on July 29, 1968 and departed on August 23, 1968, whereas it also records her occupancy from July 29 to August 3, and therefore this too must be interpreted as meaning this room was vacant on August 17, 1968. The government saw fit to leave this double entry dangling, whereas it could easily have cemented its position by calling this obviously available individual as a witness.[3] I

3. On April 5, 1970, this witness wrote a letter to the court stating:
"Dear Judge Pettine:
On Saturday, March 28, 1970, my husband received a telephone call from a Mr. Brinsfield, who identified himself as an attorney with the Department of Justice and said he was in Rhode Island checking on certain motels. He questioned my 'frequent' motel registrations when I had a Rhode Island address. My husband asked him to specify a motel, and when Mr. Brinsfield said Gray's Motel in North Kingstown, my husband explained that I am a management employee of the telephone company, normally working in Boston. During the telephone company strike in 1968, I was assigned duties in Narragansett. Since we worked long hours, I—and several other telephone people—stayed at Gray's from April, 1968, until September, 1968. Although my company retained the room on a weekly basis, I went home every seventh or eighth day. This explanation satisfied Mr. Brinsfield, who did not ask my color * * *
Subsequently, on Wednesday, April 1, 1970 we saw a news story in the Providence Evening Bulletin about the case in District Court brought against Mr. Gray, which explained Mr. Brinsfield's call. Although I don't know Mr. Gray socially and have had no connection with the motel since Sept., 1968, in the interest of justice, I feel constrained to comment on a few observations noted during my extended stay there.

am constrained to say that having elected not to do so, it must be presumed that her testimony would be adverse to the government's position.

C) Concluding this phase of its proof the government asserts that the evidence shows Rooms 32, 35, 36, 37 and 38 were unoccupied on August 17, 1968.

As to 32, the surrounding testimony is unclear except for Gray's assertion it was occupied from November 1966 to November 1968 and the lack of clarity in plaintiff's proof as to this room is equally applicable to 35. Such testimonial ambiguity compels rejection of the government's position.

As to 36, the registration card shows occupancy from September 5, 1966, to July 3, 1968. The inference urged is that the room was vacant August 17, 1968. Gray testified that the occupant was still in residence as of the date of the trial and this must be accepted, for here again the plaintiff did not see fit to call a witness readily available. This same reasoning applies to room 37 since both are considered and used as one suite—36 is a bedroom and 37 the kitchen.

Room 38 has a registration card showing residency from June 13, 1968, through June 22, 1968, and another card commencing September 14, 1968. The inference urged is that it was, therefore, vacant for the interim period covering August 17, 1968. However, Gray testified this person came in on June 10,

1967, and was still there as of the trial date. Certainly this indicates continued residency which the government didn't see fit to meet by calling the individual as a witness. This failure leaves no alternative but to accept the defendant's position.

The next proof urged by the government and the only position a reading of the evidence shows that it can take, however weak it may be, is that for August 17, 1968, four people checked in with specific check-in times recorded on their cards.

In considering this evidence which was taken purely from the cards, it must be weighed against Mr. Gray's assertion that the check-in time did not necessarily mean the actual arrival time of the parties involved and that he kept no record of the arrival times.

This evidence concerns the following individuals and times as shown on the registration cards:

1) Norman T. White—room No. 3—check-in time—5 P. M.

2) Robert Windish—room No. 24—check-in time—8 P.M.

3) A. J. Vosburg—room No. 10—check-in time—4 P. M.

4) Mary Ann Rupp—room No. 22—check-in time—3 P. M.

To begin with, room number 24 must be discounted, for it is compelling to me, as testified, that it was not part of the motel proper and that Gray's testimony

---

I did see black guests, both in the motel rooms and in the housekeeping units in the rear. They used the swimming pool, the dining room and the miniature golf course in my presence.

On two occasions, while I was eating dinner in the dining room ell adjacent to the reservation desk, I heard Mr. Gray turn parties away. One party was composed of three men—all white—noisy, disorderly, disheveled, and without luggage. Mr. Gray told them to leave. The other time, a very young couple—both white—wanted a room for a few hours. Mr. Gray gave them short shrift, saying he did not run that kind of place.

My reaction to both incidents was one of reassurance—that Mr. Gray's selec-

tivity was in my interest and safety as well as those of other guests.

I know at least two other white telephone management people assigned in Narragansett who wanted to stay at Gray's that summer, but couldn't because the motel was full.

Patently, none of these incidents involved racial discrimination. I would hope that other similar instances would be viewed in proper perspective—that circumstance, and not color, was the cause of 'no room at the inn.'

Sincerely,
Lillian P. Hanson
(Mrs. Ralph E., Jr.)

April 5, 1970"

must be accepted. He stated, and it is so stipulated by the government, that rooms 24 to 40 were housekeeping units and were rented on an entirely different "money situation" basis. As a consequence he did not consider these for Mr. Burrell or Mr. Bolden. Mr. Windish, a guest who had been there before, specifically asked for such accommodations.

Mr. Norman T. White was interviewed by the F.B.I. in the course of this investigation and was an available witness. When questioned by the agent the report shows he said his arrival was at "approximately" 5 P. M. as against Burrell's of 4:30 P. M. To this court an approximation in so short a time span fails to meet the burden of proof. This is, nonetheless, a troublesome point and if this court has committed a fact-finding error, it is unavailing to the plaintiff since it does not establish a pattern or practice as a matter of law (see Conclusions of Law, *infra*).

As to Mr. Vosburg and Mrs. Rupp the government rests on the recorded times on the registration cards as the actual arrival times. Accepting this, the evidence fails. It flies in the face of the plaintiff's position that Gray accepted the Burrell and Bolden reservations, not knowing they were Negroes and denied them occupancy when they arrived because he then could see for the first time their color, wherein lies the discrimination. It certainly follows that these rooms being rented prior to their arrival were not denied Bolden and Burrell because they were Negroes. Whatever bad motel practice it may have been, it falls far short of proving Gray guilty of racial discrimination.

The defendant's evidence does have its weaknesses, but it is unmistakable that Gray's Motel had an open policy of admitting Negro guests in military service and/or their friends or wives. This was a longstanding policy and though it is argued this was done to safeguard all armed forces business, it cannot be denied that other non-service Negroes were admitted as guests in the past. It is true that the defense only points to a small number up to August, 1968 entirely divorced from the military (Mr. & Mrs. Hill, Santiago, Alves, and Mr. & Mrs. B. T. Blue), but it is of no less force than the government's position that it must rest on only two dates— namely, July 2, 1966, and August 17, 1968—involving one single person, a couple and a father and child, because the very nature of the area involves a minor percentage of Negro transients.

The undeniable fact remains that non-service Negroes had been admitted as guests, one of whom—Santiago— stayed from March 1965 to October, 1966. He had full use of all the facilities and this is not mitigated by the fact he was recommended by a white local resident of the area. There would have been no great financial loss or risk to have refused him. In further evaluating the evidence, we cannot ignore the testimony of Gray's personal friendly attitude toward a Negro, Sgt. Blount, who as a guest was given full access and enjoyment of Gray's private quarters.

The court did not list, *supra*, another Negro civilian guest because the government discounts him, since he phoned for reservations with the request that the room be left open so that he could go directly to it and therefore no one knew he wasn't white until he checked out next morning. By the same token, there is nothing to indicate Gray considered his presence distasteful or unusual.

Considering the evidence in its entirety, as I found it to be in the exercise of my prerogative as the trial judge, I rule the government has failed to prove factually to a reasonable certainty that Mr. Gray engaged in a policy and practice of refusing to Negroes admission to and use of the same facilities of Gray's Motel as are afforded to white persons.

*Conclusions of Law—Pattern or Practice*

The statute in question, 42 U.S.C. § 2000a–5 of Title II of the Civil Rights Act of 1964 (Public Accommodations) reads, *inter alia,* as follows:

"(a) Whenever the Attorney General has reasonable cause to believe that

any person or group of persons is engaged in a *pattern or practice* of resistance to the full and equal enjoyment of any of the rights secured by this sub-chapter * * * the Attorney General may bring a civil action in the appropriate district court * * *" [emphasis added]

An interpretation of the phrase "pattern or practice" must be found in other statutes such as Section 707 of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–6) (Equal Employment) and section 813 of Title VIII of the Civil Rights Act of 1968 (42 U.S.C. § 3613) (Fair Housing) and the Congressional Record.[4]

█ It is clear that it was the intent of Congress that something more than an isolated, sporadic incident be shown. It must be repeated, routine or of a generalized nature or to state it simply—a pattern or practice requires that the complained of conduct must show a course of repeated and regularly engaged-in acts prohibited by the statute.

█ Factually, of course, the court has found that no discrimination existed at any time and the question of a finding of repeated practice does not exist. However, the plaintiff argues that even if a single act of discrimination were found to exist by Mr. Gray as to the lodging of Negroes at Gray's Motel, it would be sufficient to substantiate a suit by the Attorney General under Section 2000a–5. This argument is incompatible with this court's thinking.

The decisional law under the entire Civil Rights Act of 1964 is meager, and that is certainly why the parties here have supplied the court with little authority upon the proper interpretation of "pattern or practice." In fact this court has discovered just one case which has arisen under 42 U.S.C. § 2000a–5 and which bears upon this issue. In United States v. Medical Society of South Carolina, 298 F.Supp. 145 (D.S.C.1969) (hereinafter Medical Society), the court took an essentially objective, impersonal approach to the definition of "pattern or practice" by reasoning that a man is presumed to intend the probable consequences of his conduct and therefore:

"(w)here, as here, the defendants' course of conduct has predictably resulted in practically no Negroes being patients at Roper Hospital, this is sufficient to meet the requirements of 42 U.S.C. § 2000a–5(a)."

298 F.Supp. at 152.

Thus in one sense *Medical Society* goes beyond the definition of "pattern or practice" for which plaintiff contends here, since it seems to provide that if the *effect* of a defendant's action is to classify persons along racial lines, then defendant's *policy* is assumed to be one of "resistance" (within the meaning of the statute) to the civil right in question. Yet it is also clear that the stand-

---

4. 110 Cong.Rec. 14270 (June 18, 1964) Senator Humphrey, Floor Manager of the bill, described the meaning of "pattern or practice" as used in the public accomodations and equal employment titles of that bill as follows:

"The Attorney General may obtain relief in public accommodations and employment cases only where a pattern or practice has been shown to exist. Such a pattern or practice would be present only when the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature. There would be a pattern or practice if, for example, a number of companies or persons in the same industry or line of business discriminated, if a chain of motels or restaurants practiced racial discrimination throughout all or a significant part of its system, *or if a company repeatedly and regularly engaged in acts prohibited by the statute.*" (emphasis supplied)

Senator Keating on the day the Act was passed said:

" * * * 'pattern or practice' requirement means only that the proven discriminatory conduct of the defendant was not merely an isolated instance of racial discrimination."

See also United States v. Gulf-State Theaters, Inc., 256 F.Supp. 549 (N.D. Miss.1966); United States v. Local 189, 282 F.Supp. 39 (E.D.La.1968); United States v. Mintzes, 304 F.Supp. 1305 (D.Md.1969).

ard employed in *Medical Society* was based upon evidence of racially suspect hiring practices and discrimination in out-patient services. In the case at bar, plaintiff can point to no additional elements of defendant's "course of conduct" which are analogous to those in *Medical Society*, and therefore this court does not think that plaintiff can avail itself of the definition of "pattern or practice" employed by that court.

The only remaining substantial authority in point appears in two cases which arose under 42 U.S.C. §§ 2000e–5 and 2000e–6. These provisions parallel §§ 2000a–3 and 2000a–5, except that the former sections apply to enforcement of rights to equal employment opportunities. Section 2000e–5 provides for a private right of action and 2000e–6 authorizes the Attorney General to bring suit where he believes, *inter alia*, that defendant "is engaged in a pattern or practice of resistance" to equal employment.

In United States v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala.1968), an action under 42 U.S.C. § 2000e–6, the court maintained that there were at least three possible alternative meanings of "pattern or practice":

1) that relief under § 2000e–6 is appropriate only where a pattern or practice of resistance is found;

2) that the authority of the courts to grant relief in actions brought under § 2000e–5 by individuals acting in the capacity of "private attorney generals" (sic) should be read by implication into § 2000e–6, so that relief under 2000e–6 may be granted even where a single unlawful employment practice is shown, though not constituting a "pattern or practice";

3) that the courts should exercise their general equity jurisdiction to grant appropriate relief.

The court then decided that since the parties had not briefed arguments with respect to interpretation number 2

(which is essentially the interpretation urged by plaintiff in the instant case), it would not consider it. Instead, the court decided to exercise its "inherent equitable jurisdiction" to grant appropriate relief by enjoining, under 42 U.S.C. § 2000e–6, certain of defendant's employment practices which it found racially discriminatory, even though it found no "pattern or practice or resistance" and in fact found that defendant was "\* \* \* engaged in a pattern of compliance and implementation of equal opportunities in employment." 296 F. Supp. at 114–115.

This court expresses no opinion upon the propriety of the decision in *Porter*, except to say that upon further reflection, that court surely would have found, as this court now finds, that interpretation number 2 of "pattern or practice" is untenable. The critical fact is that §§ 2000a–3 and 2000a–5 (or, in the case of *Porter*, §§ 2000e–5 and 2000e–6) were simultaneously adopted as part of the Civil Rights Act of 1964.[5] It must be presumed, therefore, that Congress recognized that in a private individual or class action "any act or practice" prohibited by the Act would support a complaint, whereas an action brought by the Attorney General must be based upon "a pattern or practice of resistance" to equal civil rights guaranteed under the Act. The argument presented by plaintiff would completely destroy this explicit distinction established by the statutory language and substantiated by the legislative history already referred to.

There is one final bit of enlightenment available upon the proper interpretation of "pattern or practice." Dobbins v. Local 212, IBEW, 292 F.Supp. 413 (S.D. Ohio 1968), was a consolidation of separate actions brought by an individual under 42 U.S.C. § 2000e–5 and by the Attorney General of the United States under 42 U.S.C. § 2000e–6. The court held that the Attorney General was required to show that more than mere iso-

5. Sections 2000a–3 and 2000a–5 were sections 704 and 706 of Title II.

lated acts of discrimination occurred, though it conceded that:

> "In some fields a prima facie case of pattern and practice is made out on a showing that given privileges are exercised only, or for [sic] the greater extent, by [whites] and that there is in the area a substantial [Negro] population and that there have been repeated attempts by [Negroes] to exercise such rights. Such is certainly true in the education and voting fields."

292 F.Supp. at 445.

Though the court referred only to alleged discriminatory burdens upon education and voting rights, this court thinks that the *Dobbins* test for making out a *prima facie* case of "pattern or practice" is useful in the area of public accommodations also.

This court thinks, therefore, that a workable definition of "pattern or practice" must both uphold the Congressional intent and allow the flexibility and liberality of application which the Civil Rights Act of 1964 must have in order to be effective. In an attempt to clarify the meaning of that phrase, and based upon the letter and the spirit of the statute, the legislative history and the case law, this court holds that in an action brought by the Attorney General pursuant to 42 U.S.C. § 2000a–5 a single act of discrimination (even if against a member of a class of plaintiffs) is not sufficient to establish a "pattern or practice" *except* where the facts of the case illustrate clearly that further attempts to exercise one's rights under the applicable sections would be futile and a waste of time. That formulation represents this court's view of the broadest defensible interpretation of the concept of "pattern or practice." Yet plaintiff here fails to meet even this somewhat less rigorous burden of proof, and therefore must fail under 42 U.S.C. § 2000a–5.

### NOTICE TO STATE AGENCY

■ Counsel for the defendant takes the position that this action must fail because the United States did not submit the matter to a state agency prior to suit. He points to 42 U.S.C. § 2000a–3 which requires a thirty-day written notice to the appropriate state or local authority as a condition precedent to the institution of action.

This notice provision is inapplicable to this suit, for Section 2000a–3 applies to individual actions for injunctive relief, whereas Section 2000a–5 applies to civil actions brought by the Attorney General.

The notice requirement appearing in 2000a–3(c) says that absent notice, "no civil action may be brought under subsection (a) of this section * * *" It is clear "section" here means section 2000a–3(a). Therefore, this provision applies only to individual suits commenced under section 2000a–3(a) and not at all to suits brought under section 2000a–5.

I find no merit in this defense argument. It is rejected.

### ATTORNEY GENERAL'S DETERMINATION OF REASONABLE CAUSE

■ The defendant urges upon this court that the Attorney General is limited in his authority to bring an action under § 2000a–5 unless he "* * * has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance * * *" and that this is a litigable issue. He further argues that even assuming that reasonable cause does not have to be pleaded and that the defendant has no right to question preliminary proceedings whether or not the Attorney General had reasonable cause under the statute to bring the action, nevertheless, at the trial of the case the Attorney General must show that at the time of the issuance of the complaint he did have reasonable cause to believe that the defendant was engaged in a pattern or practice of resistance to the full and equal enjoyment of any rights secured by this statute. I must again reject the defendant's position.

It is apparent that this view is shared by my brother judges of other United States District Courts.

In United States v. Building and Construction Trades Council of St. Louis, 271 F.Supp. 454 (E.D.Mo.1966), a Title VII "pattern or practice" case, the court sustained the Government's objections to interrogatories seeking information as to the Attorney General's determination of reasonable cause. In the course of an earlier opinion (motion to dismiss for failure to plead reasonable cause in the complaint denied) in that same case, the court said,

> "The statute does not contemplate that the courts shall make a preliminary determination of the Attorney General's finding of reasonable cause. Rather, the court's function is to determine whether the defendants have, in fact, engaged in such a 'pattern or practice,' and to do so as expeditiously as possible."

In United States v. I.B.E.W., Local No. 683, 270 F.Supp. 233 (S.D.Ohio 1967), the defendant moved to dismiss on the ground that the United States had failed in its complaint to allege that "the Attorney General has 'reasonable cause to believe' that defendant is engaged in a 'pattern or practice of resistance to the full enjoyment of' rights described in Title VII. * * *" In denying the motion, the court said,

> "(U)nder the provisions of Rule 11, Federal Rules of Civil Procedure, a signature on a complaint, such as appears here, constitutes a certification that there is good ground to support the matters contained in the complaint."

At 235.

In Kennedy v. Lynd, 306 F.2d 222, 226 (5th Cir.1962), the Court of Appeals denied motions seeking to require the facts, including the identity of any complainant, underlying the Attorney General's determination that he had reasonable grounds to believe that there had been racial discrimination in the voting process. The court stated, "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and purpose' contained in the written demand, Section 1974b, is not open to judicial review or ascertainment."

This is further supported by the Congressional history. During the final debate on Title VII Congressman Celler, Floor Manager of the bill and chairman of the House Judiciary Committee, explained:

> "Finally, the statute contains the usual directives to the Attorney General that he should have reasonable cause before he sues, but of course, *he, not the court, decides* when a reasonable cause exists, and the issue of reasonable cause does not present a separate litigable issue."

110 Cong.Rec. 15895 (1964) (emphasis added)[6]

Under Sec. 2000a–5 the Attorney General is charged with the obligation of promoting the policy of the Federal Government to provide equal access to public accommodations throughout the United States and in the exercise of this duty he alone must make the preliminary determination of reasonable cause. It may be termed an investigatory function which, in its initial phase, demands his unquestioned subjective conclusion. This is no more violative of due process than the return of a secret indictment by a grand jury, or the filing of a civil complaint. The safeguard of the court lies in the trial process and once there the dispositive issue of "pattern or practice" is open to the test of adversary attack and impartial judicial determination. Under this system no abuse of office can be concealed carrying with it commensurate consequences. To have it otherwise would violate the intent of

---

6. See also United States v. Junction City School District No. 75, D.C., 253 F.Supp. 766; United States v. Greenwood Municipal School District, 5 Cir., 406 F.2d 1086; In re Coleman D.C., 208 F.Supp. 199; Coleman v. Kennedy, 5 Cir., 313 F. 2d 867.

Congress and impede the progress of litigation in this area.

I find that in an action instituted under the provision of 42 U.S.C. Section 2000a–5, the Attorney General's initial determination of reasonable cause is conclusive on the parties and the courts —that it does not present a separate litigable issue.[7]

Pursuant to the foregoing Findings of Fact and Conclusions of Law all relief as prayed for by the plaintiff in its complaint is denied. Judgment will be entered for the defendant, who is hereby directed to draft an order accordingly.

---

7. The issue of "reasonable cause" in this case is fundamentally and materially different from the question of "probable cause" in the criminal law, which of course, is a litigable issue. The distinction lies in the protection of Fourth and Fifth Amendment rights which the "probable cause" standard attempts to provide, entirely apart from the merits of the case. The "reasonable cause" standard by itself supports no constitutional right which is independent of the particular suit. It was merely intended as a slight burden of going forward and is subsumed in the evidence once suit is instituted.