UNITED STATES of America, Plaintiff,

v.

CITY OF YONKERS; Gerald Loehr as Mayor of the City of Yonkers; Charles Connolly as Commissioner of Police of the City of Yonkers; City of White Plains; Alfred Del Vecchio, as Mayor of the City of White Plains; John Dolce as Commissioner of Public Safety of the City of White Plains; New York State Department of Civil Service; Victor S. Bahou, as President and Commissioner of the New York State Department of Civil Service; Josephine J. Gambino and James T. McFarland, as Commissioners of the New York State Department of Civil Service, Defendants.

No. 80 Civ. 7407 (ADS).

United States District Court,
S.D. New York.

Aug. 22, 1984.

Rudolph W. Giuliani, U.S. Atty., for the Southern District of New York, New York City, for plaintiff; Jane E. Bloom, Kathleen R. Roberts, Jane E. Booth, Asst. U.S. Attys., New York City, of counsel.

Epstein Becker Borsody & Green, P.C., New York City, Arthur J. Doran, Jr., Corp. Counsel, City of Yonkers, Yonkers, N.Y., for Yonkers defendants; Susan Schenkel-Savitt, Richard L. Steer, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for State Defendants; Melvyn R. Leventhal, Stanley A. Camhi, Martha O. Shoemaker, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

On December 30, 1980, the United States filed this action against the City of Yonkers, its Mayor and Police Commissioner, the New York State Department of Civil Service, and its President and Commissioners. The suit challenged hiring procedures for the Yonkers Police Department, including written examinations administered in 1972, 1973, and 1977, physical agility tests administered in 1973 and 1977, and a height requirement in effect until 1973. The complaint alleged that these defendants engaged in a pattern and practice of discrimination on the basis of race and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17; the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 6716; the Comprehensive Employment and Training Act of 1973, Pub.L. No. 93–203, § 612, 87 Stat. 839, 882 (repealed 1982); and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d. The United States requested that defendants be ordered to employ nondiscriminatory selection procedures and sought compensation for identifiable victims in the form of jobs, backpay, and retroactive seniority. Efforts to settle the litigation originally appeared successful, but ultimately failed, necessitating long and expensive discovery, which still continues.

Meanwhile, however, both the Yonkers and the state defendants filed motions for summary judgment. They argued, first, that the Attorney General has no authority to bring this suit because the Reorganization Act under which the President has assigned him this responsibility contained an unconstitutional legislative veto provision; second, that the Act unconstitutionally delegated legislative power; third, that even if the Attorney General had authority to bring the suit he failed to fulfill statuto-

rily prescribed administrative prerequisites; and fourth, that the suit was untimely. In addition, the state defendants argued that they are not an employer for purposes of Title VII and that the eleventh amendment bars the Yonkers crossclaim against them.

Many of these contentions appeared to require a close review of the litigation's history. The trial was therefore commenced, on the supposition that by hearing the federal government's prima facie case the motions could more accurately be considered, and the overall litigation might be narrowed to avoid the great costs the parties are being forced to bear, and which are no doubt particularly burdensome for Yonkers. At the close of the initial phase of trial, the Yonkers and state defendants moved to dismiss the action pursuant to Federal Rule of Civil Procedure 41(b), arguing that the United States had failed to establish a prima facie case of a pattern or practice of discrimination.

The rulings that follow establish that the Attorney General has properly brought this case against all defendants. The defendants' challenges on various legal grounds to the propriety of this suit are therefore denied, except that the Yonkers crossclaim against the state defendants is dismissed. A separate memorandum and order will assess the sufficiency of the United States' prima facie case, after defendants have had an opportunity to crossexamine the government's expert witness.

I. *Authority of the Attorney General.*

Defendants challenge the authority of the United States to bring this litigation. They contend that the 1972 Amendments to Title VII deprived the Attorney General of independent authority to initiate pattern-or-practice suits. They also contend that the return of such authority to the Attorney General pursuant to authority granted the President in the Reorganization Act of 1978 is ineffective, because the Act included a unicameral legislative veto provision.

A. *Effect of the 1972 Amendments to Title VII.*

Section 707(a) of Title VII, upon which the United States relies for the Attorney General's authority to bring this suit, has remained unchanged since its enactment as part of the Civil Rights Act of 1964:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

Pub.L. 88–352, Title VII, § 707(a), 78 Stat. 261, 42 U.S.C. § 2000e–6.

Not until the 1972 Amendments to the Act, however, did the "person[s]" subject to its coverage come to include "governments, governmental agencies, [and] political subdivisions". 42 U.S.C. § 2000e(a) (as amended by Pub.L. 92–261, § 2(1), 86 Stat. 103). In addition, the 1972 Amendments added three subsections to section 707 which, in conjunction with the expansion in coverage, prompted considerable confusion. Section 707(c) provided for the transfer of "the functions of the Attorney General under this section ... to the Commission" as of March 24, 1974. 42 U.S.C. § 2000e–6(c). Section 707(d) provided for the continuation of all suits commenced prior to the effective date of the transfer and the substitution of the Commission as plaintiff. *Id.* § 2000e–6(e). And that subsection also provided that all such actions "be conducted in accordance with the procedures set forth in section 2000e–5 of this title." *Id.*

After enactment of the 1972 Amendments, the Attorney General consistently argued that Congress had not intended to deprive him of authority to bring pattern-or-practice suits against public employers in the absence of a referral from the Commission, but the argument fared poorly. *Compare United States v. City of Milwaukee*, 439 F.Supp. 264, 266–67 (E.D.Wis. 1977) (independent authority retained), *with United States v. Board of Education of Garfield Heights City School District*, 435 F.Supp. 949, 950–53 (N.D.Ohio 1976) (authority retained, but only upon referral from EEOC), *aff'd*, 581 F.2d 791 (6th Cir. 1978); *and United States v. State of South Carolina*, 445 F.Supp. 1094, 1110–11 (D.S.C.1977) (three-judge court) (same), *aff'd mem. sub nom. National Education Association v. South Carolina*, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978); *and United States v. Fresno Unified School District*, 412 F.Supp. 392, 394 (E.D. Cal.1976) (Attorney General "presently has no authority to act on his own initiative in a pattern or practice case)", *rev'd*, 592 F.2d 1088 (9th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979); *with id.* at 393 ("entire pattern or practice jurisdiction" transferred); *and United States v. Pima County Community College District*, 409 F.Supp. 1061, 1062–63 (D.Ariz. 1976) (authority transferred altogether; only Commission can bring pattern-or-practice suit, even against public employer). *See also Occidental Life Insurance Co. v. Equal Employment Opportunity Commission*, 432 U.S. 355, 370, 97 S.Ct. 2447, 2456, 53 L.Ed.2d 402 (1977) (noting that 1972 Amendments "transferr[ed] the authority to bring pattern-or-practice suits from the Attorney General to the Commission," but not specifying any limits to that transfer); *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 843 n. 17 (5th Cir.1975) (dictum) (noting transfer as of March 24, 1974, to EEOC of "full range of 'pattern or practice' functions" previously belonging to Justice Department); *Equal Employment Opportunity Commission v. Continental Oil Co.*, 393 F.Supp. 167, 169 n. 1 (D.Colo.1975) (dictum)

(after period of concurrent authority, "EEOC acquired exclusive power to sue in pattern or practice cases"), *aff'd*, 548 F.2d 884 (10th Cir.1977).

In 1978 President Carter exercised his authority under the Reorganization Act of 1977, 5 U.S.C. §§ 901–912, to issue Reorganization Plan No. 1. *See* 1978 U.S.Code Cong. & Admin.News 9795 (also reproduced at 5 U.S.C.A., App. 1, at 111–16 (West Supp.1984)). The Plan provided for the transfer to the Attorney General of "[a]ny function of the Equal Employment Opportunity Commission concerning initiation of litigation with respect to State or local government, or political subdivisions under section 707." *Id.* at 9800. The accompanying message of the President, however, made clear his view that no authority over the initiation of litigation against public employers had ever left the Attorney General's hands. The President observed:

> The Plan I am proposing will not affect the Attorney General's responsibility to enforce Title VII against State or local governments.... In 1972, the Congress determined that the Attorney General should be involved in suits against State and local governments. This proposal *reinforces* that judgment and *clarifies* the Attorney General's authority to initiate litigation against State or local governments engaged in a "pattern or practice" of discrimination.

*Id.* at 9798 (emphasis added). Related materials are not wholly unambiguous in this regard, however. In connection with the Reorganization Plan, President Carter issued an Executive Order intended "to clarify the Attorney General's authority to initiate public sector litigation under Section 707." Executive Order No. 12068 (June 30, 1978), *reproduced at* 43 Fed.Reg. 28971 *and* 1978 U.S.Code Cong. & Admin.News 9729. That Order referred to "[t]he functions *transferred* to the Attorney General by Section 5 of Reorganization Plan No. 1." *Id.* (emphasis added).

Committees in both the House and Senate expressed views similar to those ex-

pressed by the President in his message accompanying Reorganization Plan No. 1. The Reorganization Act provides for the automatic introduction upon the transmittal by the President of a reorganization plan of a resolution disapproving that plan in each House. 5 U.S.C. §§ 909–910. The Senate Committee Report prompted by the transmittal of Plan No. 1 states explicitly that under the 1972 Amendments the Attorney General "was to retain jurisdiction to institute pattern or practice suits under Title VII against State and Local Government employers subject to the Civil Rights Act." S.Rep. No. 750, 95th Cong., 2d Sess. 4 (1978). The relevant House Committee likewise concluded that, notwithstanding the "confusion ... in the courts and elsewhere regarding the Attorney General's right to file pattern and practice suits against ... state and local governments," the 1972 Amendments "gave to the Attorney General the authority to enforce equal employment practices" against government bodies. H.R.Rep. No. 1069, 95th Cong., 2d Sess. 8 (1978).

■ Statements of one Congress are not notably reliable guides in interpreting the intentions of a predecessor which enacted a given statute. *See, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977); *United States v. City of Miami*, 664 F.2d 435, 437 n. 1 (5th Cir.1981) (en banc) (per curiam) (Rubin, J., concurring); *Fresno*, 592 F.2d at 1093. Even so, while later observations as to the intent of the enacting Congress "are in no sense part of the legislative history," *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 200 n. 7, 98 S.Ct. 444, 449 n. 7, 54 L.Ed.2d 402 (1977), they may still provide some guidance, *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–20 & n. 13, 100 S.Ct. 2051, 2060–62 & n. 13, 64 L.Ed.2d 766 (1980); *Cannon v. University of Chicago*, 441 U.S. 677, 687 n. 7, 99 S.Ct. 1946, 1952 n. 7, 60 L.Ed.2d 560 (1979); *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 174–75 (2d Cir.1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151

(1968), particularly where, as here, "the precise intent of the enacting Congress is obscure," *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980). After reviewing the legislative history of the 1972 Amendments, the Ninth Circuit concluded "that the courts have been mistaken in holding that the Attorney General lost independent authority to initiate public sector pattern or practice suits." *Fresno*, 592 F.2d at 1093.

Between the effective date of the Reorganization Plan and the Supreme Court's decision in *Immigration and Naturalization Services v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the question whether the Attorney General had retained independent authority to bring pattern-or-practice suits against public employers after the passage of the 1972 Amendments was of little practical moment. Whatever the value of the legislative history in discerning the intentions of Congress in 1972, courts uniformly found that the views expressed by the congressional committees and the President in connection with the Reorganization Plan justified applying the Plan's allocation of responsibility to pending litigation so as to allow suits brought by the Attorney General before the effective date of the Plan to proceed. *See City of Miami*, 664 F.2d at 436 (per curiam); *id.* at 437 (Rubin, J., concurring); *Fresno*, 592 F.2d at 1093–94; *United States v. Virginia*, 620 F.2d 1018, 1022 (4th Cir.), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980); *United States v. North Carolina*, 587 F.2d 625, 626 (4th Cir.1978) (per curiam), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979); *United States v. State of New York*, 82 F.R.D. 2, 5 (N.D.N.Y.1978); *United States v. Baltimore County*, 19 Fair Empl.Prac. Cases (BNA) 397, 399–400 (D.Md.1978); *see also Garfield Heights*, 581 F.2d at 792 (Edwards, J., dissenting). But by raising doubts as to the validity of the Reorganization Act and thus the Plan promulgated under it, the Supreme Court's

**576**

decision in *Chadha* infused the question with renewed importance.

### B. *Validity of Reorganization Plan No. 1.*

■ Reorganization Plan No. 1 unequivocally invests the Attorney General with authority to initiate pattern-or-practice suits against governmental entities. Defendants contend, however, that the presence of the one-house veto in the Reorganization Act renders it unconstitutional under *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). *See also Consumers Union of United States, Inc. v. Federal Trade Commission*, 691 F.2d 575 (D.C.Cir. 1982) (en banc) (per curiam), *aff'd sub nom. United States Senate v. Federal Trade Commission*, —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1403 (1983); *Consumer Energy Council of America v. Federal Energy Regulatory Commission*, 673 F.2d 425 (D.C.Cir.1982), *aff'd sub nom., Process Gas Consumers Group v. Consumers Energy Council of America*, —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). They argue that this in turn invalidates the Plan which the President promulgated pursuant to authority granted him by that Act. *See Equal Employment Opportunity Commission v. Allstate Insurance Co.*, 570 F.Supp. 1224 (S.D.Miss.1983), *appeal dismissed for want of jurisdiction*, —— U.S. ——, 104 S.Ct. 3499, 81 L.Ed.2d —— (1984); *Equal Employment Opportunity Commission v. Westinghouse Electric Corp.*, 33 Fair Empl.Prac.Cas. (BNA) 1232 (W.D.Pa. Jan. 5, 1984) (adopting *Allstate* reasoning); *Equal Employment Opportunity Commission v. Martin Industries*, 34 Fair Empl.Prac.Cas. (BNA) 201 (N.D.Ala. Feb. 24, 1984) (same); *cf. United States v. Pasadena Independent School District*, No. 83–5107 (S.D.Tex. Jan. 6, 1984) (declaring unconstitutional § 707(c), 42 U.S.C. § 2000e–6(c), because of one-house veto provision). *But see Equal Employment Opportunity Commission v. Hernando Bank, Inc.*, 724 F.2d 1188 (5th Cir.1984); *Muller Optical Co. v. Equal Employment Opportunity Commission*, 574 F.Supp.

946 (W.D.Tenn.1983), *appeal docketed*, No. 83–5889 (6th Cir. Nov. 17, 1983); *Equal Employment Opportunity Commission v. Jackson County*, 33 Fair Empl.Prac.Cas. (BNA) 963 (W.D.Mo. Dec. 13, 1983) (adopting reasoning of *Muller Optical*); *Equal Employment Opportunity Commission v. City of Memphis*, 33 Fair Empl.Prac.Cas. (BNA) 1089 (W.D.Tenn. Dec. 29, 1983); *Equal Employment Opportunity Commission v. CBS, Inc.*, 34 Fair Empl.Prac. Cas. (BNA) 257 (S.D.N.Y. Jan. 13, 1984) (Sprizzo, J.) (oral opinion), *motion for leave to appeal pursuant to § 1292(b) granted*, No. 84–6063 (2d Cir. Feb. 28, 1984). *See also Equal Employment Opportunity Commission v. Pan American World Airways*, 33 Fair Empl.Prac.Cas. (BNA) 1232 (S.D.N.Y. Jan. 4, 1984) (Brieant, J.) (declining to decide issue until guidance from appellate courts).

Claims based on *Chadha*, similar to those addressed here, are being raised in numerous cases in connection with a variety of statutes and agencies. They have created great uncertainty as to the administrative and judicial actions taken under literally hundreds of statutes. In fact, however, most *Chadha* claims are unwarranted, and ample bases exist for their rejection. In this case, *Chadha* does not compel invalidation of the Reorganization Plan, because the one-house legislative veto provision is severable from the remainder of the Act. Furthermore, Congress ratified the Plan in subsequent legislation passed after full consideration in both Houses. Finally, and most fundamentally, defendants lack standing to complain of the mere presence in the Act of a legislative veto provision which has not been exercised to their detriment. Not only have defendants in this case failed to allege any concrete, nonspeculative injury flowing from the presence of the veto provision, but they have also failed to assert any violation of their own constitutional rights. In these circumstances, parties such as defendants who challenge laws on the basis of *Chadha* fail to allege a legally sufficient interest.

1. *Severability.* The Supreme Court essentially presumes the offending provisions of any statute are severable. " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (per curiam) (quoting *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)); *see Tilton v. Richardson,* 403 U.S. 672, 684, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1971) (plurality opinion). The absence of a severability clause, as here, is of negligible consequence to the inquiry posited. *United States v. Jackson,* 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968); *Consumer Energy,* 673 F.2d at 442; Note, *Severability of Legislative Veto Provisions: A Policy Analysis,* 97 Harv.L. Rev. 1182, 1184–86 (1984). *But see Carter v. Carter Coal Co.,* 298 U.S. 238, 312, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936) (absence of severability clause raises presumption of inseverability). It is by no means evident that Congress would not have passed the Reorganization Act if it had known the Supreme Court would declare the unicameral veto provision unconstitutional; quite the contrary, Congress knew well that the technique was of questionable validity, but passed the statute nonetheless. Much of the legislative history cited by Yonkers in support of its argument that Congress would not have enacted the Reorganization Act without a legislative veto actually leads to a contrary conclusion. The Act explicitly declares Congress' desire to reorder the executive branch to increase its efficiency. 5 U.S.C. § 901(a). The Act expresses as well the congressional determination that these ends would be expeditiously achieved by authorizing the President to redistribute executive functions. *Id.* § 901(b)–(d). Certainly, as Yonkers points out, Congress contemplated "a cooperative effort by the President and the Congress." House Report at 2. But Congress did not rely exclusively on the legislative veto to implement this concern. Rather, for the first time—and recognizing the veto's dubious validity—Congress adopted significant limitations on how the President could exercise the reorganization authority conferred. 5 U.S.C. §§ 903–905; *see* House Report at 46, 47. Thus, Congress specifically directed that no reorganization plan could have the effect of creating a new department, abolishing an old one, continuing an agency or function beyond the time authorized by law, or permitting an agency to perform a function not already expressly authorized. *Id.* § 905. Congress would have had less need to include these proscriptions if it intended the Act to stand or fall as a whole.

Yonkers recites the statement in the House Report that

> the one-house legislative veto provisions of this bill raise serious constitutional questions. The procedural modifications made by this bill in the traditional reorganization legislation, however, strengthen the role of Congress and help allay, in part, those fears of unconstitutionality. It is the judgment of the committee that the risk is worth taking and that because of the expected results in cost reduction, improved management and better services to the public this legislation should be enacted.

House Report at 3. This passage makes clear, however, that Congress was fully apprised of the shaky constitutional foundations of the veto mechanism, that it adapted that mechanism as best it could to avoid constitutional objections, but that it believed that the benefits which would flow from the substantive portions of the Act outweighed the diminution in congressional control which would result were the veto provisions severed. Congress would have preferred its legislation to remain intact. But it appears to have intended the President to exercise his authority to reorganize regardless of the fate of the questionable provision. *Accord, Hernando Bank,* at 1190–92; *Muller Optical,* 574 F.Supp. at 951–53; *CBS, Inc.,* 34 Fair Empl.Prac.Cas. (BNA) at 258.

The *Allstate* court, which reached a contrary conclusion, relied on legislative history which is unpersuasive. *See* 570 F.Supp. at 1231–32. First, the court found the provisions added by Congress to ensure consideration of every plan promulgated under the Act strong evidence that Congress regarded the veto as essential. *Id.* at 1231. But congressional efforts to adapt a favored technique in order to preserve it do not establish that the technique is indispensable to the statutory scheme. The *Allstate* court also extensively discussed Representative Brooks' concern that "Congress . . . retain control over the President's activities." *Id.* at 1232. Congress addressed this concern, however, by means of procedural alterations and substantive limitations, a strategy which Brooks' statement itself reflects. *Id.* at 1231 (quoting 123 Cong.Rec. 9344 (statement of Rep. Brooks)). One Member of Congress, Representative Drinan, unequivocally expressed his view that the unicameral veto provision was "an integral and necessary part of the legislative scheme for reorganization." House Report at 42; *see also* 123 Cong.Rec. 9352 (March 29, 1972) (statement of Representative Drinan). While Representative Drinan purported to speak for all, *see* House Report at 42 ("a proposition to which all agree"); 123 Cong.Rec. 9352 ("Congressional recognition"), his comments cannot override the import of the Act's language and structure. *See Hernando Bank*, at 1191–92. Further, the appendage of this language to the Report as "additional views" suggests that the views could not command the assent of the Committee as a whole, let alone of the Congress.

2. *Ratification.* Alternatively, the Attorney General argues that Congress cured by ratification any constitutional defect in the President's authority to promulgate Reorganization Plan No. 1 when it passed the Civil Service Reform Act of 1978, 5 U.S.C. §§ 1101 et seq. In *Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 146–48, 57 S.Ct. 407, 411–412, 81 L.Ed. 562 (1937), the President had by executive order abolished the Shipping Board and transferred its functions to the Secretary of Commerce. The plaintiff shipping company sought to restrain enforcement of an order of the Secretary which required the company to file certain records, arguing that Congress had not intended to authorize the President's action and that therefore the Secretary had no authority to issue the order. The Court found sufficient ratification of the President's action in Congress' reference in a subsequent act to the functions of the former Shipping Board as "now vested in the Department of Commerce pursuant to § 12 of the President's Executive Order No. 6166." 300 U.S. at 148, 57 S.Ct. at 411 (quoting § 204(a) of the Merchant Marine Act of 1936).

The federal government argues that Congress ratified the reallocation of authority embodied in Reorganization Plan No. 1, including the assignment to the Attorney General of authority to bring pattern-or-practice suits against public employers, when it passed the Civil Service Reform Act of 1978, Pub.L. 95–454, 91 Stat. 1111, 5 U.S.C. § 1101 et seq. It points to section 905 of Public Law 95–454, which provided that "[a]ny provision in either Reorganization Plan Numbered 1 or 2 of 1978 inconsistent with any provision in this Act is hereby superseded." *See* 5 U.S.C.A. § 1101 notes (West Supp.1984). The *Muller Optical* court relied on this reference to find ratification, but did so in conjunction with two appropriations acts which provided monies to the Commission to perform the responsibilities at issue there. 574 F.Supp. at 954. Yonkers contends that, standing alone, this oblique reference in the Civil Service Reform Act cannot be read as congressional endorsement of the President's plan.

The Civil Service Reform Act recognizes the validity of the Reorganization Plans only by negative implication, but as clearly as the ratification found in *Isbrandtsen-Moller.* But see *Pasadena*, slip op. at 4. As the Attorney General contends, unless Congress accorded the Plan the full force and effect of law, it need not have stated specifically that the Act was to supersede

the Plan wherever inconsistent. Contrary to Yonkers' suggestion, the legislature did not act to prevent mere "haggling" over whose distribution would prevail. Congressional primacy in this sphere is clear. *See generally Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587–89, 72 S.Ct. 863, 866–68, 96 L.Ed. 1153 (1952).

The *Allstate* court relied on *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), in holding that Congress had not effectively ratified Reorganization Plan No. 1. But *Greene* refused to find congressional ratification of security clearance procedures in use by the Department of Defense on the basis either of congressional "acquiescence" in the program or of congressional appropriation of funds because the proffered appropriations involved a wholly unrelated program. While the language in *Greene* counseled caution in finding ratification "in areas of doubtful constitutionality," *see* 570 F.Supp. at 1234 (quoting 360 U.S. at 507, 79 S.Ct. at 1419); *see also* Yonkers Reply Memo at 17–18, the constitutional doubts to which *Greene* referred went to the very conduct for which the Department of Defense sought ratification. Here, by contrast, doubts as to the constitutionality of the legislative veto make necessary an inquiry into ratification, but no question exists as to the underlying propriety of that for which ratification is sought—enforcement of Title VII by the Attorney General. Finally, unlike in *Greene,* here the government does not attempt to characterize mere acquiescence as ratification, but points to an explicit reference in subsequent, validly enacted legislation. Thus, even were the legislative veto provision of the Reorganization Act inseverable, the Attorney General would have authority to prosecute this suit. *Accord, Officers for Justice v. Civil Service Commission,* 20 Fair Empl.Prac. Cas. (BNA) 179 (N.D.Cal.1978).

3. *Standing.* Unlike Mr. Chadha, the Yonkers and state defendants here do not complain of injury resulting from congressional exercise of a reserved veto power, but rather of the "mere presence" in the Reorganization Act of a legislative veto provision. *Hernando Bank,* at 1192 n. 2. The finding of severability deprives them of standing to press their challenge to this provision, as they suffer no injury so long as independently operable provisions authorize the Attorney General to bring suit. *See also Chadha,* 103 S.Ct. at 2774; *id.,* 634 F.2d at 415; *Consumer Energy Council,* 673 F.2d at 441 n. 48; Note, *Severability of Legislative Veto Provisions: A Policy Analysis,* 97 Harv.L.Rev. 1182, 1189–91 (1984).

More fundamentally, defendants lack standing to press this argument because they can identify no concrete, nonspeculative injury which flows from the prosecution of this suit by the Attorney General instead of by some other representative of the executive. While "every defendant has standing to question the legal authority of the plaintiff to sue," *Allstate,* 570 F.Supp. at 1227, it does not follow that defendants always have standing to challenge one federal officer's authority to sue as opposed to another's. Where, as here, the underlying authority of the United States to bring this action is not at issue, *see supra* pp. 573–574 (noting authority of EEOC to bring suit under the 1972 amendments), defendants cannot complain of injury stemming from subjection to suit, but only of an amorphous, inarticulable injury deriving from the identity of the government plaintiff. The injury alleged, however, must be "distinct and palpable," and not "abstract" or "conjectural" or "hypothetical". *Allen v. Wright,* —— U.S. ——, ——, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). And the Supreme Court has repeatedly held that "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Id.* at ——, 104 S.Ct. at 3326. Under these circumstances, defendants have failed to allege a "personal stake in the outcome of the controversy" sufficient to confer standing. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *see also Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) (per curiam) (plaintiff who chal-

lenges constitutionality of act but fails to allege any injury to himself has no standing to assert rights of others).

Contrary to the assumption of the *Allstate* court, 570 F.Supp. at 1228 n. 7, the inappropriateness of speculating as to what another agency (such as the EEOC here) might have done reinforces the conclusion that defendants have suffered no nonspeculative injury which the requested relief would redress. In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 43–46, 96 S.Ct. 1917, 1926–1928, 48 L.Ed.2d 450 (1976), the Court held that standing to challenge a government grant of tax exempt-status to hospitals could not be based on the asserted link between the grant of the exemption and the hospitals' policy regarding services to indigents. Finding that the causal connection depended on the decisions hospitals would make in response to withdrawal of the tax-exempt status, the Court held that those decisions were sufficiently uncertain to break the chain of causation between plaintiffs' injury and the challenged government action. Similarly, in the instant case the causal connection between the government's allegedly unlawful conduct and the defendants' vulnerability to suit depends on the decision the EEOC would make in response to a termination of the Attorney General's authority to sue. Just as in *Simon*, this decision is sufficiently uncertain to break the chain of causation between defendants' alleged injury and the challenged government action. *See Warth v. Seldin*, 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617–18, 93 S.Ct. 1146, 1148–1149, 35 L.Ed.2d 536 (1973); *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (summarizing core requirements for Article III standing); *cf. McCorkle v. United States*, 559 F.2d 1258, 1261–62 (4th Cir.1977) (no standing to challenge constitutionality of inseverable legislative veto provision where a finding of unconstitutionality would not entitle plaintiff to requested relief), *cert. de-*

*nied*, 434 U.S. 1011, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).

But even assuming that defendants in this case had suffered concrete, nonspeculative injury (e.g., if the United States' authority to sue had been coextensive with that of the Attorney General), defendants nevertheless would lack standing to challenge the constitutionality of the legislative veto provision. Although a defendant in an enforcement proceeding who is resisting the imposition of state force upon him has standing in every sense to assert in his defense any claimed constitutional rights of his own, it does not follow that he is also entitled to raise the defense that the law being enforced against him violates the constitutional rights of others. P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *The Federal Courts and the Federal System* 184–91 (2d ed. 1973); *See Allen v. Wright,* — U.S. at ——, 104 S.Ct. at 3325 (noting general prohibition on a litigant raising legal rights of another); *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960) ("litigant may only assert his own constitutional rights or immunities"); *Barrows v. Jackson*, 346 U.S. 249, 256–57, 73 S.Ct. 1031, 1035–36, 97 L.Ed. 1586 (1953) (affirming general rule that a party cannot challenge statute's constitutionality "unless he can show that he is within the class whose constitutional rights are allegedly infringed"); *see also Eisenstadt v. Baird*, 405 U.S. 438, 443–44, 92 S.Ct. 1029, 1033–34, 31 L.Ed.2d 349 (1972) (explaining that while defendants in such circumstances have sufficient interest in challenging the statute's validity to satisfy the "case or controversy" requirement of Article III, the question whether a litigant may assert third party rights is governed by judicially imposed rule of restraint).

In challenging the validity of the Reorganization Act on the ground that it contains an unconstitutional legislative veto provision, defendants here are asserting in their defense not their own constitutional rights, but those of Congress. Because the overarching concern of the Court in *Chadha* was preserving the constitutional separa-

tion-of-powers structure, it is Congress, and not private litigants, whose rights are threatened by the existence of an inseverable legislative veto provision in a statutory scheme.

■ Defendants here thus fall squarely within the general rule that "a litigant may only assert his own constitutional rights or immunities," *Raines,* 362 U.S. at 22, 80 S.Ct. at 523, and they should be denied standing to assert Congress' rights absent special circumstances justifying a departure from the articulated rule. *See* Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L.Rev. 423, 425–26 (1974) (noting Court's "general presumption against the assertion of [jus tertii] claims" and identifying considerations that have prompted departure from general rule to include: the presence of a substantial relationship between the claimant and third parties; the impossibility of the rightholders' asserting their own constitutional rights; and the need to avoid a dilution of third parties' constitutional rights). No special circumstance that would justify a departure from the general rule is applicable to defendants' challenge to the presence of the legislative veto provision in the Reorganization Act. There is no special relationship between Congress and defendants and no link between defendants' alleged injury and the constitutional rights of Congress, *cf. Chadha,* 103 S.Ct. at 2776 (direct link between Chadha's alleged injury stemming from deportation order and Congress' right to reserved veto power), and thus there is no risk here that denying defendants standing to assert the *Chadha* principle will dilute Congress' rights. *See* Note, *supra,* 88 Harv.L.Rev. at 431; *cf. Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (permitting doctor to assert constitutional rights of patients because of the accessorial and professional relationship between them); *NAACP v. Alabama,* 357 U.S. 449, 458–59, 78 S.Ct. 1163, 1169–70, 2 L.Ed.2d 1488 (1958) (permitting NAACP to assert constitutional rights of its members, and emphasizing in part the close relationship between the jus tertii claimant and the third party rightholders).

Moreover, Congress' acquiescence in Reorganization Plan No. 1 by declining to use the offending veto makes clear the absence here of any separation-of-powers conflict and hence of any danger of dilution. Defendants are thus raising the crucially important constitutional issue of *Chadha* solely in an attempt to gain immunity from a suit which both Congress and the President agree the Attorney General should have the authority to bring. Absent a dispute between the branches, a private litigant should not be permitted to dress up an individual complaint in the guise of a fundamental constitutional challenge, in a context in which the institutions having a stake in the outcome have no desire to raise or litigate such a challenge. Given circumstances in which the constitutional separation-of-powers structure is genuinely threatened by the existence of a veto provision in a legislative enactment, the institutions having a direct stake in the outcome are "not without effective ways to assert these rights." *McGowan v. Maryland,* 366 U.S. 420, 430, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393 (1961); *cf. Barrows,* 346 U.S. at 255–59, 73 S.Ct. at 1034–37 (permitting assertion of third party's rights where defendant was the only party who could effectively vindicate those rights); *NAACP,* 357 U.S. at 459, 78 S.Ct. at 1170 (permitting NAACP to assert rights of its members, and emphasizing in part the inability of third parties to assert their own rights).

Precluding parties such as defendants here from raising the *Chadha* issue will spare the federal and state courts from having to decide complex issues of severability and ratification in numerous contexts where only private interests, and no constitutional separation-of-powers interests, are served by the decisions. In the process, such a rule will minimize the arguably disruptive effects of *Chadha* in contexts where no controversy exists between the executive and legislative branches. *See generally Chadha,* 103 S.Ct. at 2792–96 (White, J., dissenting); *see also* Strauss, *Was There a Baby in the Bathwater?: A*

*Comment on the Supreme Court's Legislative Veto Decision,* 1983 Duke L.J. 789, 805–06 (dangers of legislative veto identified in *Chadha* are least troublesome when case involves dispute between legislative and executive branches).

## II. *Unconstitutional Delegation.*

■ Citing *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), Yonkers argues that the Reorganization Plan constitutes an impermissible delegation of legislative power. Though little used, the doctrine of undue delegation may remain alive. *See Consumer Energy Council of America v. Federal Energy Regulatory Commission,* 673 F.2d 425, 448 n. 82 (D.C.Cir. 1982), *aff'd mem. sub nom., Process Gas Consumers Group v. Consumers Energy Council of America,* — U.S. —, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). The detailed guidance provided the President by the Act, however, makes the argument frivolous here. *See* 5 U.S.C. §§ 903–905.

## III. *Administrative Prerequisites.*

### A. *Title VII Jurisdiction.*

■ Defendants contend that, even if the Attorney General has authority to initiate pattern-or-practice suits against public employers pursuant to section 707 and Reorganization Plan No. 1, he may not do so before fulfilling a series of administrative steps analogous to those including notice, a fact-finding investigation, formal findings, and an opportunity for conciliation. They argue that the Attorney General has afforded them no such safeguards here. The Attorney General recognizes no prerequisites to his authority to bring this suit except his unreviewable determination that reasonable cause exists to believe that a government body is engaged in a pattern or practice of discrimination. The Attorney General suggests, however, that as a matter of policy he accords public employers the procedural protections of notice and an opportunity to participate in settlement procedures. Defendants point to the language of the Reorganization Plan, which directed that "[a]ny function" of the Commission with respect to initiation of litigation against public employees under section 707, as well as "all necessary functions related thereto, including investigation, findings, notice and an opportunity to resolve the matter without contested litigation," be transferred to the Attorney General. The Plan further instructed that the Attorney General exercise these functions "in accordance with procedures consistent with said Title VII."

In *United States v. Masonry Contractors Association of Memphis, Inc.,* 497 F.2d 871, 875–76 (6th Cir.1974), the court rejected the argument that when bringing a suit under section 2000e–6 the Attorney General has "to comply with the provisions of § 2000e–5 as to notice, informal methods of correction of the discriminatory acts, and the time limits for filing a complaint." The only prerequisite to such a suit, the court held, was the Attorney General's determination that there was reasonable cause to believe that a pattern or practice of discrimination existed. *Id.* at 876; *see also Equal Employment Opportunity Commission v. United Air Lines, Inc.,* 12 Fair Empl.Prac.Cas. (BNA) 1592 (N.D.Ill. 1975) (EEOC need not fulfill § 706 administrative prerequisites when it replaces Attorney General in pattern-or-practice suit against private employer). Courts addressing this question after the transfer of public employer responsibility to the Commission and clarification of the Reorganization Plan have been less definitive in their holdings. *See Baltimore County,* 19 Fair Empl.Prac. Cases (BNA) at 400–01 (after finding adequate opportunity to conciliate, noting alternatively that the "Attorney General is not under the law required to follow regulations promulgated by the Equal Employment Opportunity Commission which apply where a private employer is involved"); *United States v. State of New York,* 82 F.R.D. 2, 5 (N.D.N.Y.1978) (citing *Masonry Contractors* and *Baltimore County,* but stating only that "the Attorney General in this lawsuit has satis-

fied whatever prerequisites are necessary for initiation of a 'pattern or practice' suit brought under Title VII"); *United States v. Fresno Unified School District*, 592 F.2d 1088, 1095–96 (9th Cir.1979), *rev'g* 412 F.Supp. 392 (E.D.Cal.1976), *cert. denied*, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979); *United States v. State of New Jersey*, 473 F.Supp. 1199, 1205 (D.N.J.1979); *see also* B. Schlei & P. Grossman, *Employment Discrimination Law* 1181–82 (2d ed. 1983); C. Sullivan, M. Zimmer & R. Richards, Federal Statutory Law of Employment Discrimination § 3.13 (1980). The Ninth Circuit observed that this language from the Plan reiterated many of the requirements of section 706, and found that the "apparent intent of the Reorganization Plan is to incorporate all § 706 requirements applicable to pattern or practice suits." *Fresno*, 592 F.2d at 1095–96.

The President seems unlikely to have intended to shackle the Attorney General with the administrative machinery to which the Commission is subject. In the Executive Order implementing section 5 of the Plan, the President instructed the Attorney General to perform the transferred functions "in accordance with Department of Justice procedures heretofore followed under section 707." It was clear before passage of the 1972 Amendments that the Attorney General had authority to initiate pattern-or-practice litigation under section 707 without complying with any of the conditions imposed by section 706. *See Masonry Contractors*, 497 F.2d at 875–76; *see also United States v. State of New Jersey*, 473 F.Supp. 1199, 1204 (D.N.J. 1979). Moreover, the President issued his Order after Committees of both Houses, in response to the President's transmittal of the Plan, had expressed a clear congressional purpose to restore to the Attorney General his authority in this sphere as it had existed before the 1972 Amendments. The reference in the Order therefore should be read as the President's recognition that the only procedures relevant to the Attorney General's authority under section 707 were those of the Department of Justice.

In any case, the Reorganization Act did not confer on the President authority to impose new requirements on the exercise of the Attorney General's power; nor has Congress anywhere expressed an intention to do so. The Ninth Circuit in *Fresno* found the Attorney General subject to section 706 procedures in pattern-or-practice suits because section 707(e), which by its terms does not apply to the Attorney General, imposed these procedures on the Commission during the time it exercised public sector authority. Thus, though the *Fresno* court itself recognized that Congress had never intended to transfer this authority to the Commission, *see* 592 F.2d at 1093, it in effect ruled that during its brief and unintended sojourn with the Commission, the Attorney General's public sector authority had accreted a complex set of administrative prerequisites not previously applicable. This conclusion contravenes the professed intention of Congress to disentangle this authority from judicially imposed constraints. In enacting section 707 Congress intended "to provide the government with a swift and effective weapon to vindicate the broad public interest in eliminating unlawful practices." *New York*, 473 F.Supp. at 1202 n. 4 (quoting *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 843 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976)). This purpose would not be well served by engrafting onto the statute conditions to suit that Congress itself did not prescribe.

The *New Jersey* court rejected the holding in *Fresno*, but concluded without explication that "the determination of reasonable cause in and of itself mandates that the Attorney General make sufficient investigations and findings, and give appropriate notice as well as opportunity to resolve the matter without litigation." 473 F.Supp. at 1205–1206 n. 15a. This ruling led the New Jersey court to examine the investigation performed by the Attorney General, the correspondence between federal and state officials, and their settlement efforts, before concluding "that plain-

tiff had reasonable cause to bring suit and that its actions prior to the initiation thereof were sufficient for the purposes of section 707." *Id.* at 1206. Yet a line of cases referred to earlier in the same opinion, of which *United States v. International Association of Bridge, Structural and Ornamental Iron Workers, Local 1,* 438 F.2d 679 (7th Cir.), *cert. denied,* 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971) is representative, stands solidly for the proposition that in proceedings brought under section 707(a) courts should not put the Attorney General's determination of reasonable cause to a preliminary evaluation, but should examine only whether there has been a violation of the statute. *See Iron Workers,* 438 F.2d at 680–82; *United States v. Philadelphia Electric Co.,* 351 F.Supp. 1394, 1398–99 (E.D.Pa.1972); *United States v. Building and Construction Trades Council of St. Louis, Missouri,* 271 F.Supp. 447, 452–53 (E.D.Mo.1966); *cf. United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 125 n. 14 (5th Cir.) (Fair Housing Act, 42 U.S.C. § 3613), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973); *United States v. Greenwood Municipal Separate School District,* 406 F.2d 1086, 1088–91 (5th Cir.) (public education provision of Civil Rights Act of 1964, 42 U.S.C. § 2000c–6) *cert. denied,* 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969); *United States v. Gray,* 315 F.Supp. 13, 22–24 (public accommodations provision of Civil Rights Act, 42 U.S.C. § 2000a–5). And as the *New Jersey* court noted, Representative Cellar, Chairman of the House Judiciary Committee and floor manager for the bill which became Title VII, stated that the Attorney General "should have a reasonable case before he sues, but of course, he—not the court—decides whether reasonable cause exists, and the issue of reasonable cause does not present a separate litigable issue." 110 Cong.Rec. 15895 (1964), *quoted at* 473 F.Supp. at 1204 n. 12; *see Iron Workers,* 438 F.2d at 681 n. 3; *Gray,* 315 F.Supp. at 23.

Moreover, judicial inquiry into determinations of reasonable cause demeans the role of the Attorney General in enforcing the civil rights laws. Since the earliest legislative efforts to effectuate the long-dormant promises of the Civil War Amendments, modern Congresses have called upon the Attorney General to enforce them and accorded him broad latitude in deciding when to do so. *See, e.g.,* Civil Rights Act of 1957, Pub.L. No. 85–315, 71 Stat. 634, 42 U.S.C. § 1971(c) (authorizing Attorney General to bring suit in federal district courts to prevent racially motivated interference with voting rights where "there are reasonable grounds to believe that any person is about to engage" in any such act or practice); *United States v. Mississippi,* 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). Judicial intrusion upon the Attorney General's discretion would be both unwise and unauthorized. Public employers may look for protection from unfounded suits to "the test of adversary attack and impartial judicial determination," which is normally regarded as a wholly adequate remedy. *Gray,* 315 F.Supp. at 23.

Section 707 itself prescribes the only prerequisite to the Attorney General's authority to bring a pattern-or-practice suit—reasonable cause. *Masonry Contractors,* 497 F.2d at 876; *New Jersey,* 473 F.Supp. at 1205. Once the Attorney General has certified that reasonable cause exists to believe that a public employer is engaged in a pattern or practice of discrimination against members of a protected group, "[t]he only issue for the court ... is whether there has been a violation of the statute and not whether the Attorney General had reasonable cause to believe there was a violation." *Iron Workers,* 438 F.2d at 681. Therefore, the court entertaining such suit need not review the notice provided the defendants before suit, the Attorney General's investigation, communications between the eventual parties, or their efforts to settle.

In any case, the record here reveals extensive prelitigation efforts to settle the dispute, dating from April 1980, when the government notified Yonkers and the State

that the Attorney General had authorized suit, and December of that year, when the government filed. *See* Booth Declaration (Feb. 3, 1984), Exhibits A–C (Yonkers); Booth Declaration (Feb. 17, 1984), Exhibits A–P (State); *see also* United States' Chronology of Communications Between (1) Yonkers and the United States Attorney's Office and (2) Yonkers and the Office of Revenue Sharing at 1–3 & Exhibits 1–12 (April 30, 1984); Yonkers' Chronology of Communications Between (1) Yonkers, N.Y.S. and the United States Attorney's Office and (2) Yonkers and the Office of Revenue Sharing at 1–8 & Exhibits 1–48 (July 2, 1984). Nor would the doctrine of laches operate to bar this suit. *Compare Equal Employment Opportunity Commission v. Alioto Fish Co.*, 623 F.2d 86, 88–89 (9th Cir.1980), *with Equal Employment Opportunity Commission v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69 (3d Cir.1984). The record establishes that the United States has acted diligently throughout.

B. *Alternative Bases of Jurisdiction.*

In addition to Title VII, the Attorney General bases this suit on the nondiscrimination provisions of the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 6716; the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789(c)(3); and the Comprehensive Employment and Training Act of 1973, 29 U.S.C. § 991 (omitted by Pub.L. No. 95–524, 92 Stat. 2013, Oct. 27, 1978). Defendants contend that the Government has failed to exhaust administrative remedies and therefore cannot avail itself of the corresponding sections of these statutes authorizing the Attorney General to bring suit.

■ 1. *Revenue Sharing Act.* The relevant provision of the Revenue Sharing Act authorizes the Attorney General to bring a civil suit against a state or local government which the Attorney General "has reason to believe has engaged or is engaging in a pattern or practice" of discrimination, and specifies the relief which a court may grant. 31 U.S.C. § 6720. Like section 707, this provision is complete in itself; it makes no reference to the procedures applicable upon a finding of discrimination by the Secretary of the Treasury. *Compare id. with id.* §§ 1617–1619. Defendants proffer neither case authority nor legislative history to support their contention that these procedures apply when the Attorney General brings a pattern-or-practice suit. Section 6720 is similar in wording and structure to section 707(a) of the Civil Rights Act, 42 U.S.C. § 2000e–6(a). No reason exists to read it other than to confer on the Attorney General independent authority to initiate pattern-or-practice litigation against public employers, without regard to the administrative mechanism prescribed for the Secretary. *Accord, Baltimore County,* 19 Fair Empl.Prac. Cases (BNA) at 401–02.

■ 2. *Crime Control Act.* The relevant provision of the Crime Control Act similarly authorizes the Attorney General to bring a pattern-or-practice suit on finding "reason to believe that a State government or unit of local government is engaged or is engaging in a pattern or practice" of discrimination in connection with a funded program. 42 U.S.C. § 3789(c)(3). By contrast, the immediately succeeding subsection authorizes suit "by the person aggrieved" only "after exhaustion of administrative remedies." *Id.* § 3789d(c)(4)(A). No reason exists for implying a requirement of exhaustion as a precondition to the independent authority of the Attorney General to bring suit under the Crime Control Act.

■ 3. *Fiscal Assistance Act (CETA).* Again, the wording of the relevant provision tracks the model in section 707(a), providing that the Attorney General may bring suit "whenever he has reason to believe that a prime sponsor or eligible applicant is engaged in a pattern or practice in violation of the [nondiscrimination] provisions of this section." 29 U.S.C. § 991(c). This language appears in disjunction with that authorizing the Attorney General to sue upon a referral from the Secretary of

Labor, and thus the authority of the Attorney General to initiate pattern-or-practice suits clearly does not depend on the procedural requirements applicable to the Secretary. The defendants contend by analogy to section 707 that the requirements of section 706 apply, but nothing in the text suggests the argument, which in any event lacks merit even as applied to section 707.

## IV. *Timeliness*

Section 707(a) specifies no time period within which the Attorney General must file suit. Defendants urge the court to apply an analogous state statute of limitations. Relying on *Murphy v. American Home Products*, 58 N.Y.2d 293, 461 N.Y. S.2d 232, 448 N.E.2d 86 (1983), Yonkers suggests the three-year period provided in CPLR § 214.2 for actions to recover upon statutorily imposed liabilities, which would render the complaint untimely as to the 1972 and 1973 examinations. Relying on *People v. New York City Transit Authority*, 90 A.D.2d 766, 455 N.Y.S.2d 295 (2d Dep't 1982), the State alternatively suggests the one-year period of section 295(5) of the Executive Law, which would render the entire complaint untimely.

Defendants' arguments ignore the impact of *Occidental Life Insurance Co. v. Equal Employment Opportunity Commission*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), *aff'g*, 535 F.2d 533 (9th Cir.1976). *See* Memorandum and Order (Feb. 25, 1983) at 3. After concluding that the Act contained no limitation period in which the Commission had to bring an enforcement action, the *Occidental* Court refused to borrow the analogous state statute of limitations. *Id.* 432 U.S. at 366–72, 97 S.Ct. at 2454–57. Instead, where a defendant might be "significantly handicapped in making his defense because of an inordinate delay by EEOC in filing the action," the Court chose to rely on the capacity of trial courts "to locate 'a just result' in light of the circumstances peculiar to the case." *Id.* at 373, 97 S.Ct. at 2458 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2375, 45 L.Ed.2d

280 (1975)). By pointing out during its review of the enforcement procedure envisioned by the 1972 Amendments that the Attorney General would prosecute cases against governmental bodies, the Court implied that its analysis applied to these suits as well. *Id.* 432 U.S. at 360 n. 11, 97 S.Ct. at 2451 n. 11.

The Court in *Occidental* premised its analysis, however, on the safeguards provided by the time limitations for the initial filing of charges:

> Congress did express concern for the need of time limitations in the fair operation of the Act, but that concern was directed entirely to the initial filing of a charge with the EEOC and prompt notification thereafter to the alleged violator. The bills passed in both the House and the Senate contained short time periods within which charges were to be filed with the EEOC and notice given to the employer. And the debates and reports in both Houses made evident that the statute of limitations problem was perceived in terms of these provisions, rather than in terms of a later limitation on the EEOC's power to sue. That perception was reflected in the final version of the 1972 Act, which requires that a charge must be filed with the EEOC within 180 days of the alleged violation of Title VII, and that the alleged violator must be notified "of the charge (including the date, place and circumstances of the alleged unlawful employment practice) ... within ten days" thereafter.... Within this procedural framework, the benchmark, for purposes of a statute of limitations, is not the last phase of the multistage scheme, but the commencement of the proceeding before the administrative body.

*Id.* at 371–72, 97 S.Ct. at 2457 (footnotes omitted). This premise adequately supports the Court's conclusion as to individual complaints regardless whether the suit is eventually prosecuted by the Commission against a private employer or the Attorney General against a public body. Conversely, however, it reduces the value of the hold-

ing where, as with the authority of the Attorney General to bring pattern-or-practice suits against public employers, no requirement exists that a charge first be filed.

The inapplicability of the administrative procedures discussed in *Occidental* should not operate to subject the Attorney General's authority to initiate pattern-or-practice litigation to state statutes of limitation, however. *Cf. Donovan v. Square D Co.*, 709 F.2d 335, 339 n. 10 (5th Cir.1983) (refusing to apply state statute of limitation to anti-retaliation suit brought by Secretary of Labor under OSHA § 11(c), which authorizes award of reinstatement with back pay, notwithstanding absence of requirement of prompt notification of employer upon filing of complaint). The statutory purpose elucidated in *Occidental* would be undermined by allowing state statutes to inhibit the exercise by the Attorney General of one of the most potent of the statutory tools. *Accord, United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 934–35 (10th Cir.1979); *Officers for Justice v. Civil Service Commission*, 20 Fair Empl.Prac.Cas. 179, 183–84 (N.D.Cal.1978).

█ Moreover, as a general rule, state statutes of limitation do not apply when the government sues to enforce rights belonging to the sovereign. *United States v. Summerlin*, 310 U.S. 414, 416–18, 60 S.Ct. 1019, 1020–21, 84 L.Ed. 1283 (1940); *United States v. Beebe*, 127 U.S. 338, 344, 8 S.Ct. 1083, 1086, 32 L.Ed. 121 (1888); *United States v. Thompson*, 98 U.S. (8 Otto) 486, 488–90, 25 L.Ed. 194 (1878). The Courts of Appeals which considered the question prior to *Occidental* agreed that when the government sued for injunctive relief under Title VII it sought to vindicate the public interest and thus could avail itself of this rule. *See Occidental*, 535 F.2d at 536–40; *Equal Employment Opportunity Commission v. Kimberly-Clark Corp.*, 511 F.2d 1352, 1359–60 (6th Cir.), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975); *Equal Employment Opportunity Commission v. Griffin Wheel Co.*, 511 F.2d 456, 458–59, *modified*

*on petition for rehearing*, 521 F.2d 223 (5th Cir.1975); *see also United States v. Georgia Power Co.*, 474 F.2d 906, 922–923 (5th Cir.1973); *Equal Employment Opportunity Commission v. Christiansburg Garment Co.*, 376 F.Supp. 1067, 1071–73 (W.D.Va.1974); *Equal Employment Opportunity Commission v. Eagle Iron Works*, 367 F.Supp. 817, 823–24 (S.D.Iowa 1973); *Equal Employment Opportunity Commission v. Duff Brothers, Inc.*, 364 F.Supp. 405, 406–07 (E.D.Tenn.1973). In *Griffin Wheel*, however, the Fifth Circuit drew a distinction between that part of the complaint which sought injunctive relief and that which sought back pay, concluding that back pay was "private ... in nature" and thus subject to the state statute of limitations regardless of the identity of the named plaintiff. 511 F.2d at 459; *see Christiansburg*, 376 F.Supp. at 1072–73; *Eagle Iron Works*, 367 F.Supp. at 823–24. Earlier that court had specifically rejected the Attorney General's contention that he sued as sovereign when seeking back pay in a pattern-or-practice action and thus was immune to state statutes of limitation, holding instead that "[i]nsofar as the pattern or practice suit constitutes a proper legal conduit for the recovery of sums due individual citizens rather than the treasury, it is a private and not a public action." *Georgia Power*, 474 F.2d at 923.

In *Occidental* the Ninth Circuit rejected the Fifth Circuit's *Georgia Power-Griffin Wheel* distinction. 535 F.2d at 537. The court relied by analogy on the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, and cited *Nabors v. National Labor Relations Board*, 323 F.2d 686, 688–689 (5th Cir.1963), in which the Fifth Circuit had applied the *Summerlin* rule to hold that state statutes of limitation do not bind the National Labor Relations Board in enforcement proceedings even when it seeks back pay. 535 F.2d at 538. Relying on *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 778 n. 40, 96 S.Ct. 1251, 1271 n. 40, 47 L.Ed.2d 444 (1976), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975), the Ninth Circuit in *Occidental*

found that, like the NLRA, Title VII serves a "broadly prophylactic as well as remedial" role. 535 F.2d at 538. It concluded that the possibility that the Commission suit might "operate to confer an incidental benefit on private persons does not detract from this public purpose." *Id.* (quoting *Nabors,* 323 F.2d at 688–89); *cf. Donovan v. Square D Co.,* 709 F.2d 335, 338 (5th Cir.1983) (notwithstanding availability of reinstatement with back pay, state statutes of limitations inapplicable to antiretaliation suits brought by the Secretary of Labor under OSHA § 11(c) because such suits further public goals); *Marshall v. Intermountain Electric Co.,* 614 F.2d 260, 262 (10th Cir.1980) (same); *Citronelle-Mobile Gathering, Inc. v. O'Leary,* 499 F.Supp. 871, 879–80 (S.D.Ala.1980) (refusing to allow state limitations statute to bar government's claim for restitution in enforcement action under § 209 of Economic Stabilization Act of 1970).

In affirming the Ninth Circuit in *Occidental* the Supreme Court relied wholly on congressional purpose, concluding that application of the analogous state statutes of limitations would "be inconsistent with the underlying policies of the federal statute" and "interfere with the implementation of national policies." 432 U.S. at 367, 97 S.Ct. at 2455. It neither endorsed nor rejected the Ninth Circuit's treatment of the limitations issue. *But see* 432 U.S. at 380–84, 97 S.Ct. at 2461–63 (Rehnquist, J., dissenting in part) (when seeking recovery of back pay for individuals, United States does not sue in its sovereign capacity). The Court's reliance on a narrower ground of congressional purpose does not imply disapproval of the public-rights analysis employed by the lower court. *See Donovan v. Square D Co.,* 709 F.2d at 338 n. 8 (5th Cir.1983); *Marshall v. Intermountain Electric Co.,* 614 F.2d 260, 262–63 & n. 5 (10th Cir.1980). Moreover, in *Occidental* the Court again emphasized that Title VII enforcement proceedings raise issues of broad public importance when it stated that "the EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties...." 432 U.S. at 368, 97 S.Ct. at 2455.

Even assuming, however, that the United States does not sue in its sovereign capacity where, as in *Occidental,* the Commission brings an action on behalf of an individual complainant, it certainly does so where, as here, the Attorney General determines there is reasonable cause to believe that a governmental entity is engaged in a pattern or practice of resistance to the rights guaranteed by Title VII and, at root, the fourteenth amendment. Congress and the Court have repeatedly recognized the special importance of these rights. *See, e.g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 451–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976) (Rehnquist, J.) (legislating pursuant to section five of fourteenth amendment, Congress abrogated states' eleventh amendment immunity in enacting 1972 Amendments to Title VII). Title VII serves "societal as well as personal interests," *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973), and Congress designed the pattern-or-practice suit specifically "to vindicate the broad public interest in eliminating unlawful practices, at a level which may or may not address the grievances of particular individuals," *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 843 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Though the relief sought may include back pay for specific individuals or a class, the pattern-or-practice action is decidedly not "a case where the Government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person". *Beebe,* 127 U.S. at 344, 8 S.Ct. at 1086 (quoted in *Occidental,* 432 U.S. at 382, 97 S.Ct. at 2462 (Rehnquist, J., dissenting in part)). *Franks, Albemarle Paper,* and *Occidental* establish that all Title VII proceedings promote the public interest. But given the special authority conferred upon the Attorney General by section 707(a) and the special obligation of government employers to afford all citizens equal employment opportunity, a pattern-or-practice suit brought by

the Attorney General does so most directly. *Cf.* 432 U.S. at 383 n. 6, 97 S.Ct. at 2463 n. 6 (Rehnquist, J., dissenting in part) (declining to consider "whether a different result would follow when the EEOC brings suit upon a complaint initiated by one of its members" pursuant to 42 U.S.C. § 2000e–5(b)).

Alternatively, the Attorney General argues that this suit is timely even if the analogous state statute of limitations applies, as the continuing use of an eligibility list is a continuous wrong under *Guardians Association v. Civil Service Commission*, 633 F.2d 232 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). Because the Attorney General's authority to prosecute this action is not subject to any statute of limitations, no need exists to consider this ground, including the effect on *Guardians* of the Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). *Compare Bronze Shields, Inc. v. New Jersey Department of Civil Service*, 667 F.2d 1074, 1082 n. 21, 1083 n. 23 (3d Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982), *with id.* at 1091–93 (Higginbotham, J., dissenting and concurring). *See also Walls v. Mississippi State Department of Public Welfare*, 730 F.2d 306, 319 (5th Cir.1984).

## V. *Status of State of New York as Employer.*

■ Title VII reaches discriminatory conduct only by an "employer," an "employment agency," or a "labor organization." 42 U.S.C. § 2000e–2(a)–(c). The statute defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees" for a specified period and "any agent of such a person", *id.* § 2000e(b); it defines an employment agency as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person," *id.* § 2000e(c).

The State points out that the statutory definition of labor organization obviously does not apply, and contends that its limited role of providing Yonkers at the request of its Municipal Civil Service Commission a written test for use in selecting police officers cannot bring it within the definition either of employer or employment agency.

The New York State Constitution requires that civil service appointments and promotions in the state and its municipal divisions be made according to merit and fitness to be ascertained as far as practicable by competitive examination. N.Y. Const. art. V, § 6. The Civil Service Law permits a municipal jurisdiction to conduct its own examination or hire an independent testing service. N.Y.Civ.Serv.Law §§ 17(4), 50(1); Pillsworth Affidavit ¶ 6 (Feb. 3, 1984). Each municipality, however, has the option to request the State Civil Service Department to provide "service relative to the announcement, review of applications, preparations, construction, and rating of examinations, and establishment and certification of eligible lists for positions in the classified service," which the Department must then provide. N.Y. Civ.Serv.Law § 23(2). The Civil Service Law provides that such service be provided "without charge," so municipalities have a strong incentive to avail themselves of the state assistance, which Yonkers requested and the department provided in connection with the 1972, 1973, and 1977 Yonkers police examinations. Once the municipality exercises its statutory option to enlist the state's aid, its only role in the preparation, conduct, and scoring of the examination is in physically administering it. The State retains complete control over how an applicant's score is figured; the municipality cannot adjust the score in any way. *Pagano v. Municipal Civil Service Commission of the City of Yonkers*, No. 79–6958 (Sup.Ct. Westchester C'ty Apr. 21, 1980). The Department grades the tests and determines the qualifying score. And while a candidate's score is only one element of the selection criteria, he or she must pass the test to be eligible for appointment. *See Teal v. State of Connecticut*, 645 F.2d 133,

135 (2d Cir.1981), *aff'd,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).

Moreover, not only is the test score important in generating an eligibility list, state law allows the Commission to exert significant control over these lists even after promulgated. If the Commission, which is functionally equivalent to the Department, determines that the provisions of the civil service law have not properly been carried out, it may "rescind any appointment" made from an eligible list, "remove from any eligible list established by a municipal commission the name of any person thereon," or "rescind any examination or eligible list or cancel an appointment already made from a list so rescinded." N.Y.Civ.Serv.Law § 25. In addition, the Commission may exercise supervisory authority over municipal commissions. The Commission may after hearing remove a municipal civil service commissioner or personnel officer for "incompetency, efficiency, neglect of duty, misconduct or violation of the provisions" of the Civil Service Law, in which event the state commission has exclusive jurisdiction to appoint a successor for the unexpired portion of the removed commissioner's term. *Id.* § 24. And the municipal commission must submit to the state annual reports, as well as "such other reports ... as the [state] commission may require," and must make all proceedings and papers available for inspection by the state commission. *Id.* § 26.

For Title VII purposes, the term "employer" encompasses "'any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an "employer" of an aggrieved individual as that term has generally been defined at common law.'" *Spirt v. Teachers Insurance and Annuity Association,* 691 F.2d 1054, 1063 (2d Cir.1982) (quoting *Vanguard Justice Society Inc. v. Hughes,* 471 F.Supp. 670, 696 (D.Md.1979)), *vacated on other grounds,* —— U.S. ——, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983), on remand, 735 F.2d 23 (2d Cir.1984); *see, e.g., Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 391 (8th Cir.1977); *Rivas v. State Board for Community Colleges and Occupational Education,* 517 F.Supp. 467, 470 (D.Colo.1981); *Curran v. Portland Superintending School Committee,* 435 F.Supp. 1063, 1072–73 (D.Me.1977); *Puntolillo v. New Hampshire Racing Commission,* 375 F.Supp. 1089, 1091–92 (D.N.H.1974). In *Vanguard,* the court found the Baltimore City Civil Service Commission an employer because it "exercised substantial authority and discretion in the area of testing of applicants for entry level positions with the [Police] Department," even though the Commission played a concededly limited role in the hiring process. 471 F.Supp. at 696; *see id.* at 692–93. In *Rivas,* the court found a Community College Council an employer because it confirmed appointments to the professional staff, even though the State Board had exclusive hiring authority. 517 F.Supp. at 470. In *Curran,* the court found the City of Portland an employer because its role in appropriating funds which paid the salaries of school personnel was essential to the functioning of the school system, even though the city charter prohibited the city from involvement in the actual administration and management of its school system. 435 F.Supp. at 1073. And in *Puntolillo,* the court found the Racing Commission and the Trotting and Breeding Association employers because through their control of stall space and licenses to race they "controll[ed] .... access to [plaintiff's] job market," even though the relationship between the defendants and the driver-trainers did not involve the "normal incidents of a typical employment relationship." 375 F.Supp. at 1090–92 (quoting *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir. 1973)).

The more recent cases of *Vanguard* and *Rivas,* as well as the Second Circuit's formulation in *Spirt,* suggest a conclusion different from the finding in *Vulcan Society v. Fire Department of the City of White Plains,* 82 F.R.D. 379, 395–96 (S.D.N.Y. 1979), that the state civil service commission did not exercise sufficient control to qualify as an employer of municipal fire-

fighters in Yonkers, White Plains, Mount Vernon, and New Rochelle. In denying alternative motions to dismiss or for summary judgment, Judge Sweet distinguished *Sibley, Puntolillo,* and *Curran* because the Department was "not alleged to have a degree of control, either by legal or financial power, as extensive as in the[se] three cases." *Id.* at 396 n. 28. In any event, as in *Vulcan,* the record here on summary judgment is sufficient at least to raise a triable issue of fact as to whether in administering the test and providing consultation and advice the Department functioned as an "agent" of the employer Yonkers. *Id.* at 396; *see also Gill v. Monroe County Department of Social Services,* 79 F.R.D. 316, 334 (W.D.N.Y.1978).

Yonkers does not completely delegate its selection process to the state by virtue of enlisting its aid on the test. Though the state wholly controls the process by which the test results are reached, the municipality determines how those results are to be used in the selection procedure—for example, whether the candidates will simply pass or fail, or rank competitively, and, if ranked, what weight will be accorded this component. In addition, within limits specified by state law, *see* N.Y.Civ.Serv.Law § 58, the municipality determines which other factors, such as age, education, residence, and physical capacity, will be included among the selection criteria and what weight, if any, will be accorded each. Moreover, the statutory provisions allowing for rescission of appointments, removal of commissioners, and periodic receipt of reports by the state commission obviously contemplate simple oversight of the affairs of municipal civil service commissions, not active participation in them. Nevertheless, as this court has already noted in denying the state's motion to dismiss, the testing function which the state has regularly assumed for Yonkers is "at the heart of the allegations of discrimination in this case." Memorandum and Order at 2 (February 25, 1982). Within that sphere of competitive testing, the undisputed facts reveal that the department exercised complete autonomy. On the record on summary judgment, triable issues of fact exist as to whether the state thus acted as Yonkers' agents for purposes of Title VII.

Indeed, the record after presentation of the Attorney General's prima facie case strongly supports the view that the State acted as an employer in connection with police hiring in Yonkers during the years covered by the complaint. The Municipal Services Division (MSD) provided ongoing advice, consultation, and instructions to Yonkers officials on civil service and equal employment opportunity matters. In 1972 and 1973, MSD personnel instructed Yonkers that women were ineligible to take the patrolman's examination. When in 1973 MSD changed its position and advised Yonkers to permit women to take the exam, it cautioned that the applicants would have to meet all requirements for the position, which then included minimum height. In 1974 MSD advised Yonkers that it could not appoint selectively from an eligibility list in order to reach persons who spoke Spanish, nor to tap minorities on the theory that they would serve best in minority neighborhoods. Yonkers routinely sought and MSD routinely provided advice on Yonkers' obligations under laws pertaining to the employment of police officers, and MSD routinely distributed circular letters to municipal civil service commissions, including Yonkers', on civil service matters. Yonkers officials regularly followed the instructions provided, and if a circular from MSD said that something was required by law, the Commission never failed to implement it. Transcript 480, 597–98, 650. Yonkers sought assistance from MSD regarding the administration of civil service law. Transcript 180, 478, 491. MSD provided legal advice and interpretations of laws pertaining to the employment of police officers. Gov't Exhibits 115, 311, 313, 377 (age requirement); Gov't Exhibits 161, 162 (height requirement); Gov't Exhibit 121 (fees for examinations); Gov't Exhibits 453, 454 (conciliation of EEOC changes); and Gov't Exhibit 519 (appointments from expiring eligible list). MSD also closely reviewed all aspects of the Yonkers Com-

mission's work. Transcript 475, 659, 321. It conducted Management Surveys of the Yonkers Commission every two or three years. Mary Polipko testified that MSD employees reviewed eligibility books, the "operation of the office, job specifications, checking of payrolls, everything we did they looked into." After the review, MSD issued a report with suggestions for improvement, and the Yonkers Commission adopted the suggestions. Transcript 661; Gov't Exhibits 111, 310, 360, 534. The State Commission approved all rule changes proposed by the Yonkers Commission, Transcript 1333–34.

MSD served also as the conduit for and interpreter of the medical, physical fitness, height, weight, and other standards of the Municipal Police Training Council, some of which state law requires police officers to meet. *See* N.Y.Civ.Serv.Law § 58. DCS employees participated in the development and review of these standards, and MSD collected information on their use from municipalities. MSD forwarded to Yonkers instructions on the application of these standards and fielded questions on their interpretation. It also sent representatives to observe the administration of the physical fitness exams. Transcript 599. On one occasion MSD described the "voluntary" physical fitness exam as "imperative" and insisted that it had "been used in the field for a number of years and are found to be valid." Gov't Exhibit 110 at 12. Finally, when Yonkers considered switching to an exam that had been designed and tested by private sector services, the State made a concerted effort to convince Yonkers officials not to switch, asserting that a great deal of work had gone into analysis of the examination and assuring Yonkers that it was valid. *See* Transcript 775–76, 903–04, 987–88, 992, 1331–32; *see also* Gov't Exhibits 188, 413.

## VI. *Eleventh Amendment.*

■ Yonkers interposed a crossclaim against the state defendants, alleging that any liability assessed against it was caused by the State defendants' failure to provide a fair and nondiscriminatory test. Yonkers Defendants' Answer with Cross-Claim ¶¶ 28–34 (May 15, 1981). Relying on *Pennhurst State School & Hospital v. Halderman*, — U.S. —, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the state defendants moved to dismiss this claim which Yonkers based on Title VII and unspecified "New York State law." Answer with Cross Claim ¶ 33. Yonkers has correctly agreed that its crossclaim is legally insufficient.

In *Pennhurst* the Court held that neither the doctrine of *Ex parte Young* nor that of pendent jurisdiction permits a federal court to award injunctive relief against a state official for violations of state law. *See* 104 S.Ct. at 909–20. Yonkers contends correctly that congressional abrogation of the eleventh amendment immunity of the states in Title VII removes that obstacle for litigants to the extent they can ground liability in the statute. But in this case Yonkers seeks contribution, which the Supreme Court held unavailable in Title VII actions in *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981).

The motions for summary judgment are denied.

SO ORDERED.